UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON

    *Plaintiff*,

v.

UNITED STATES CENTERS FOR DISEASE
CONTROL AND PREVENTION et al.,

    *Defendants*.

Civil Action No. 25-1020 (TJK)

**MEMORANDUM OPINION**

    Until recently, those seeking records from the Centers for Disease Control and Prevention submitted requests under the Freedom of Information Act to a specialized office. But the parent agency for CDC changed that structure a few months ago. Now, the Department of Health and Human Services routes FOIA requests for CDC records—and for the records of its other component agencies—to a centralized office. As part of that overhaul, HHS placed on administrative leave the employees who had once manned the CDC FOIA office.

    Citizens for Responsibility and Ethics in Washington, a watchdog organization, believes that this restructuring amounts to an unlawful shutdown of CDC's FOIA operations. And the resulting lack of transparency into CDC's activities is especially problematic, CREW argues, because of ongoing debates about how effectively the agency has addressed the recent rise in measles cases. So CREW submitted five FOIA requests to CDC—one for records about how the agency handled an assessment of measles and vaccination rates, and four for records about closing the CDC FOIA office. Days later, CREW sued CDC, HHS, and the heads of each agency. It then moved for a preliminary injunction requiring Defendants to expedite processing of CREW's

requests and to make the CDC FOIA office operative again.

CREW has raised serious questions about whether Defendants have acted unlawfully with how they have suddenly revamped the FOIA process for HHS and its component agencies. But that is not enough for preliminary relief. Instead, CREW must show that it will suffer irreparable harm without that relief. And CREW falls short on this front. The records sought are not so integral to a time-sensitive debate that they will lose their value without expedited processing and production. Nor is any other harm that CREW's organizational mission might suffer irreparable. Thus, the Court will deny CREW's motion for a preliminary injunction.

## I.     Background

### A.     The Freedom of Information Act

The Freedom of Information Act ("FOIA") requires agencies to make records available to any person whose request "reasonably describes such records" and satisfies agency procedures. 5 U.S.C. § 552(a)(3)(A). An agency must determine "whether to comply with such request" within twenty business days of receiving it, plus an extra ten in unusual circumstances. *Id.* § 552(a)(6)(A), (B). If the agency decides to comply, it must make responsive, non-exempt records "promptly available" to the requester. *Id.* § 552(a)(6)(C)(i).

Sometimes a requester may qualify for a faster track. A requester who establishes "'a compelling need' or falls within 'other cases determined by the agency' is entitled to expedited processing of his request." *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 92 (D.D.C. 2020) (quoting § 552(a)(6)(E)(i)). Although agencies may define those "other cases," FOIA defines "compelling need," which requires a showing that (1) non-expedited treatment "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," or (2) "with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government

2

activity." § 552(a)(6)(E)(v). An agency must process a qualifying request "as soon as practicable." § 552(a)(6)(E)(iii).

FOIA imposes other obligations on agencies beyond the processing and production of records. For example, "[e]ach agency" must "make available for public inspection" certain "administrative staff manuals" and copies of released records likely to be subject to repeat requests. § 552(a)(2)(C), (D). Agencies must also create systems to assign "individualized tracking number[s]" to requests and establish methods for communicating with requesters. § 552(a)(7). And to ensure "efficient and appropriate compliance," each agency must "designate a Chief FOIA Officer." § 552(j)(1), (2). All told, FOIA imposes several statutory requirements on covered agencies so that "citizens" can "know what their Government is up to"—a "structural necessity in a real democracy." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (internal quotation marks and citation omitted).

### B.   HHS, CDC, and the FOIA Requests

In early February 2025, President Trump issued an executive order to implement his "'Department of Government Efficiency' Workforce Optimization Initiative." 90 Fed. Reg. 9669 (Feb. 11, 2025). That order directed agencies to "promptly undertake preparations to initiate large-scale reductions in force." *Id.* at 9670. The Department of Health and Human Services ("HHS") "announced a dramatic restructuring" in late March to comply with this directive. Press Release, HHS, HHS Announces Transformation to Make America Healthy Again (Mar. 27, 2025), https://www.hhs.gov/about/news/hhs-restructuring-doge.html. Part of that "overhaul," the agency explained, was "downsizing from 82,000 to 62,000 full-time employees." *Id.*

Some of that downsizing happened in offices that handle FOIA requests for HHS and its sub-agencies. Historically, HHS used a decentralized FOIA system; different HHS components

3

like the Centers for Disease Control and Prevention ("CDC") each had "independently run FOIA offices." ECF No. 18-1 ("Holzerland Decl.") ¶ 6. But on April 1, the CDC FOIA office sent an automated email to Citizens for Responsibility and Ethics in Washington ("CREW") stating that "the FOIA office has been placed on admin leave." ECF No. 13-11. The next day, someone used the same email account to tell CREW that "[t]he entire CDC FOIA Office has been placed on administrative leave prior to a mandated June 2 separation date." ECF No. 13-12. That email tracks the declaration of an anonymous CDC employee, who explained that the agency's FOIA employees were some of the 2,000 CDC employees who "received" an "email stating that they will be separated from HHS effective June 2, 2025." ECF No. 13-16 ¶ 4. And the FOIA team lost access to CDC offices on April 1 and computer systems on April 2. *Id.* ¶ 5. Defendants—CDC, Acting Director Monarez, HHS, and Secretary Kennedy—do not dispute that the independent CDC FOIA office no longer exists (or, at the very least, is no longer operational).[1] Instead, they maintain that a centralized office within HHS—the "Office of the Secretary" FOIA division, or "OS-FOIA"—will "process FOIA requests that involve[]" HHS components like "CDC moving forward." Holzerland Decl. ¶¶ 1, 17; *see also, e.g.*, *id.* ¶ 37 (discussing the "integration of the CDC-FOIA workload" into OS-FOIA).

CREW submitted five FOIA requests to CDC on April 1—right around when the FOIA employees were placed on administrative leave. *See* ECF No. 13-3 ("Goldstein Decl.") ¶¶ 8–12. The first sought records about "CDC's decision not to release an assessment" discussing "the risk

---

[1] Defendants quibble with whether the emails from the CDC account were "authorized." *See* ECF No. 25-1 ¶ 14. That question is irrelevant to whether the CDC FOIA employees were placed on administrative leave—something that Defendants never discuss when describing the allegedly "unauthorized" emails sent from what looks like an official CDC email address. And Defendants concede that these "*former* CDC-FOIA employees . . . received . . . Reduction in Force (RIF) notices." *Id.* (emphasis added).

of catching measles in relation to the vaccination rates of nearby areas." ECF No. 13-4 at 2. The second requested communications "relating to the decision to place the CDC FOIA office on administrative leave." ECF No. 13-5 at 2. Relatedly, the third asked for information about the administrative-leave decision but specifically sought to ferret out DOGE's involvement. *See* ECF No. 13-6 at 2. CREW's fourth request targeted records "describing CDC's plans to" handle FOIA requests and comply with statutory obligations. ECF No. 13-7 at 2. And the fifth request was narrower, seeking records about "CDC's plan to take down its FOIA portal website" and "to provide an automated email response" to requesters. ECF No. 13-8 at 2. CREW sought expedited processing for all five requests—the first because the rise in measles cases has allegedly been a major news story, ECF No. 13-4 at 5, and the rest because closing the CDC FOIA office purportedly implicates important questions about CDC's commitment to transparency and FOIA compliance, *see* ECF Nos. 13-5 at 5, 13-6 at 5, 13-7 at 5, 13-8 at 5.

  CREW sued Defendants three days later. *See* ECF No. 1 ("Compl."). CDC has "suppressed information about . . . the need for vaccination" amid a measles outbreak, CREW says, and shuttering the CDC FOIA office during a public-health crisis violates both FOIA and the Administrative Procedure Act, *see id.* ¶¶ 39, 62, 67, 73. According to CREW, those violations warrant declaratory and injunctive relief, including an order directing Defendants "to promptly comply" with FOIA's requirements "by assigning sufficient personnel and resources to timely process CREW's FOIA requests." *Id.* at 19. CREW then moved for a preliminary injunction and partial summary judgment in late April. *See* ECF No. 13. The Court held the latter motion in abeyance and set a briefing schedule for the former. And in mid-May, the parties appeared for a hearing on the motion for preliminary relief.

  While the parties briefed CREW's motion for a preliminary injunction, HHS's Office of

the Secretary responded to all five requests to expedite. The agency granted the measles-focused request because "the subject matter" showed "an urgency to inform the public" about the alleged government activity. ECF No. 18-2 at 13. But it denied the remaining four—those targeting records about the restructuring (in Defendants' words) or shutdown (in CREW's) of the CDC FOIA office—because CREW had not shown the same degree of urgency. *See id.* at 1–12. As things stand, CREW's "expedited request" for records about the measles report sits last in HHS's "expedited queue" of 70 requests. ECF No. 25-1 ("Holzerland Supp. Decl.") ¶ 26. Defendants have not clarified the status of CREW's non-expedited requests in their opposition or supplemental filing. *See, e.g., id.* ¶ 19 (asserting vaguely that HHS "is taking actions consistent with its statutory obligations under the FOIA relative to . . . FOIA requests seeking CDC records," but providing no details about CREW's requests).

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). To obtain that remedy, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

A showing of irreparable harm is a must. Before the Supreme Court's decision in *Winter*, a sliding-scale approach permitted a "weak showing on one factor to be overcome by a strong showing on another." *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 96. Since then, the D.C. Circuit has suggested that *Winter* ushered in a stricter regime in which plaintiffs must show *both* a likelihood of success on the merits *and* irreparable harm. *See Sherley v. Sebelius*, 644 F.3d 388, 392–

6

93 (D.C. Cir. 2011). In any event, "it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion" for preliminary relief. *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 96 (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). And the mere "possibility of irreparable harm" is not enough; granting a preliminary injunction on that basis would be "inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing" of entitlement to it. *Winter*, 555 U.S. at 22.

Although "[i]t is rare that *any* preliminary relief is appropriate in a FOIA case," these familiar principles still apply. *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 92. A FOIA plaintiff seeking a preliminary injunction must clear the "high standard for irreparable injury" set by the D.C. Circuit. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Specifically, a qualifying "injury 'must be both certain and great,'" and "it must be actual" rather than "theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). More than that, the injury must be truly "irreparable"—*i.e.*, "beyond remediation." *Id.* So courts in this District "have generally found irreparable harm in FOIA preliminary-injunction cases only where the requested documents are time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost." *Heritage Found. v. EPA*, No. 23-cv-748 (JEB), 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (citation omitted).

**III.    Analysis**

As with many FOIA cases seeking preliminary relief, this one turns on whether CREW has "carried [its] heavy burden of demonstrating irreparable harm." *Heritage Found. v. U.S. Dep't of State*, No. 24-cv-2862 (TJK), 2024 WL 4607501, at *4 (D.D.C. Oct. 29, 2024) (citation omitted).

7

It presses two theories on this score. First, CREW says that it will suffer irreparable injury "absent expedited processing of its requests." ECF No. 13-1 at 42. Without faster disclosure, CREW contends, it will be unable to give the public important information relevant to ongoing debates about measles and transparency within HHS and CDC. *See id.* at 43–46. And second, CREW argues that irreparable injury will result if "CDC's FOIA functions remain inoperative." *Id.* at 46. CREW's mission relies on FOIA to obtain and "disseminat[e] information to the public." *Id.* And in CREW's view, the harm to that "organizational mission[] cannot be wound back." *Id.* at 48.

Neither theory makes this "FOIA case" the "rare" one warranting "preliminary relief." *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 92. The first falters because CREW has not shown that the records will imminently lose significant value without a preliminary injunction. And the second falls short because, on this record, any harm to CREW's organizational mission caused by HHS's FOIA overhaul is not irreparable harm under FOIA. Since the failure to show irreparable injury is "grounds for refusing to issue a preliminary injunction," the Court need not address the remaining factors. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

### A. CREW Will Not Suffer Irreparable Harm Without Expedited Processing of its FOIA Requests

In general, the key for irreparable harm in the FOIA context is whether the records sought contain information that will likely become "stale" sometime soon. *Heritage Found.*, 2024 WL 4607501, at *5 (quoting *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 101). It is not enough that the records are "indisputably valuable in informing the public" about newsworthy topics, even important ones like "how the federal government functioned in preserving public health during a global pandemic." *N.Y. Times Co. v. Def. Health Agency*, No. 21-cv-566 (BAH), 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021) (denying preliminary injunctive relief because the records at issue were "not 'time-sensitive' in the sense of losing value vis-à-vis any date certain"). If the

8

irreparable-harm test turned only on the importance of the records, then preliminary injunctions would become the norm. That is why "[c]ourts in our district" usually insist on more—specifically, a showing that "the requested documents are 'time-sensitive and highly probative'" with respect to "an imminent event," and that the "utility of the records would be lessened or lost" after the event. *Heritage Found.*, 2023 WL 2954418, at *4 (citation omitted). Put differently, the "touchstone for the FOIA irreparable-harm analysis" is whether the plaintiff "show[s] a specific need for records" that would have "little to no relevance" after "an upcoming event" passes. *Heritage Found.*, 2024 WL 4607501, at *5 (citation omitted).

CREW has not cleared this hurdle. The records it seeks pertain to how CDC handled a report about measles and vaccines (a request for which HHS already granted expedited processing), what happened to the CDC FOIA office, and how CDC plans to address FOIA requests moving forward. CREW seems to concede that it cannot point to an imminent event that will render the information in these records stale. *See* ECF No. 13-1 at 43 (arguing that "CREW need not 'point to any concrete deadline by which it needs the records'" (citation omitted)); *see also* ECF No. 23 ("Hearing Tr.") at 17. That makes sense. After all, "there is no expiration date" for contributing to—or even "reignit[ing]"—"public discussion about" how CDC dealt with this measles report or how HHS reorganized its FOIA operations, even if that restructuring eliminated the CDC-specific FOIA office. *Heritage Found.*, 2024 WL 4607501, at *12 n.12 (internal quotation marks and citation omitted). CREW, no doubt, would prefer to add to those conversations sooner rather than later. But countless FOIA requesters could say the same. And at bottom, CREW never explains how any "debate" about HHS's FOIA structure will "end[]" at a given time such that information about that topic will lose significant value. *Brennan Ctr. for Just.*, 498 F. Supp. 3d at 102. Rather, CREW could "use any records" it might obtain "to challenge" or otherwise criticize

HHS's actions at any time. *Zorn v. DOJ*, No. 24-cv-3360 (CRC), 2025 WL 35929, at *4 (D.D.C. Jan. 6, 2025) ("public critiques of how an agency handles a matter have no expiration date" (internal quotation marks, citation, and alterations omitted)).[2]

Angling to dodge that problem, CREW insists that the caselaw does not foreclose preliminary relief just because a FOIA plaintiff cannot identify a specific event that would render the information stale. True, at least in theory. There are a few cases in which courts have found irreparable harm when the records at issue would contribute to "ongoing public and congressional debates about issues of vital national importance"—say, debates about the "legality" of "high-profile government action" like "military strikes against the Syrian government"—without pointing to a specific date when the records would become stale. *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 299–301 (D.D.C. 2017) (internal quotation marks and citations omitted). Still, even in those cases, time-sensitive external events meant that the relevant ongoing debates could not be meaningfully "restarted or wound back." *Id.* at 301 (citation omitted). So in *Protect Democracy*, for instance, the lack of a specific end date for the debate was less of an issue because "hostilities between" the "U.S and Syria" had "recent[ly] escalat[ed]," and the "White House" had suggested that "another chemical weapons attack" could happen soon. *Id.* In other words, the plaintiff there showed that the records sought might imminently lose significant

---

[2] For these reasons, CREW's reliance on *Doctors for America v. Office of Personnel Management*, 766 F. Supp. 3d 39 (D.D.C. 2025), is misplaced. To begin, *Doctors for America* is not a FOIA case. Instead, an organization of doctors and health-care professionals sought to temporarily restrain an agency from "removing or modifying health-related webpages and datasets" that those professionals used "regularly in treating patients." *Doctors for Am.*, 766 F. Supp. 3d at 45. And that organization showed irreparable harm through its members because, for example, one doctor could not treat an "outbreak of Chlamydia" at a high school that she served without the "crucial" data and information. *Id.* at 54 (citation omitted). The record, then, showed that the doctors had "a time-limited ability" to "treat certain patients." *Id.* at 55. But because CREW has not identified such a "time-limited" restraint on doing its job—*i.e.*, informing the public debate—this case does not help it show irreparable harm.

value because the relevant debate had reached a boiling point, and another military strike could happen at any moment without the public knowing what the records said about its legality. *Id.* at 300.

*Center for Public Integrity v. United States Department of Defense* drives this point home. That case involved requests for records "directly tied to . . . current, ongoing impeachment proceedings" against President Trump. 411 F. Supp. 3d 5, 12 (D.D.C. 2019). Because those proceedings could have "result[ed] in the removal of the President from office," the requests related to matters "of the highest national concern." *Id.* And although the impeachment process lacked a "precise end-date," the proceedings were "intended to conclude by the end of the year"—just over a month after Judge Kollar-Kotelly issued her opinion. *Id.* at 13. The nature of the ongoing impeachment proceedings, moreover, was such that they *would* certainly end. And that feature threatened to relegate the requested records to mere "historical value" in the near future. *Id.* at 12.

CREW has not compensated for the lack of a specific and certain imminent event with anything like the kind of showing made in these cases. Focusing on the report about measles and vaccination rates first, CREW says that its request for records about how CDC allegedly buried that assessment "relate[s] to a 'time-sensitive' public health emergency." ECF No. 13-1 at 43 (citation omitted). But that argument hits several snares. To begin, Defendants have already granted expedited processing for the measles-related request. *See* ECF No. 18-2 at 13. So part of the relief sought—"requir[ing] Defendants to grant expedited processing," *see* ECF No. 13 at 1—is moot, and ordering it would not prevent any harm. Nor does CREW press a claim for date-certain production, so it lacks a basis for jumping over other "requests granted expedited processing." *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 8, 14–15 (D.D.C. 2015).

CREW also appears to seek faster processing of its already-expedited request to ward off

11

a harm related to the public's exposure to measles. Even assuming this theory includes an element of time-sensitivity, it still does not help CREW meet its burden. Core to the irreparable-harm requirement is that the "harm" must "*directly* result from the action" that the plaintiff "seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (emphasis added). But here, any such "purported harm[]" related to the public health that CREW appears to assert hinges on "theoretical injuries" from the lack of immediate disclosure, with "no assurance"—or even likelihood—that "the remedy for" the "public health ills" that CREW worries about "is production of the" records subject to the request. *N.Y. Times*, 2021 WL 1614817, at *1, *8 (no irreparable harm in FOIA case seeking "extensive data regarding the federal government's nationwide effort to distribute coronavirus vaccines").

Indeed, the gap between the requested records and any theoretical harm related to the public health is yawning, and CREW identifies no bridge. Its request asks only for records about "CDC's *decision* not to release an assessment" about "the risk of catching measles" based on nearby vaccination rates—not the assessment itself. ECF No. 13-4 at 2 (emphasis added). In other words, CREW targets information about an internal agency decision rather than CDC data about measles rates, treatments, or severity. And even if CREW had requested the assessment, no party disputes that its apparent commonsense conclusion—"the risk of catching measles is high in areas with low vaccination rates"—has been reported. Compl. ¶ 39; ECF No. 13-1 at 23. So although information about why CDC withheld a particular report might interest the public, CREW has not shown what its motion appears to presuppose: that its FOIA request targets records with information unknown to the public that could directly and materially impact the recent uptick in measles cases. At most, under CREW's theory, the requested records might offer some reason for the public to hesitate before trusting CDC's advice. If so, that information would be valuable, but public reporting on

the assessment already covers part of this waterfront.  *See* Compl. ¶ 39 & n.12 (citing *ProPublica* article about the allegedly withheld report).  In this way, any "delay in . . . production is not halting . . . oversight" about this issue, even if that oversight would "undoubtedly be served" by that production.  *N.Y. Times*, 2021 WL 1614817, at *9.

The strongest case for CREW is probably *American Immigration Council v. DHS,* 470 F. Supp. 3d 32 (D.D.C. 2020).  There, a plaintiff requested records about how the U.S. Immigration and Customs Enforcement was "respon[ding] to the COVID-19 pandemic."  *Id*. at 34.  That request was extensive: it sought not only information about ICE's medical screening, sanitization procedures, and plans for segregating at-risk detainees, but also "data" about COVID-19 testing and positivity rates.  *Id.*  So in addition to contributing to ongoing "public discourse" about "ICE's handling of the global pandemic," the request targeted information that would "guide on-the-ground efforts" and "*directly* impact detained immigrants."  *Id.* at 37 (emphasis added) (internal quotation marks and citation omitted).  On these facts, the district court granted a preliminary injunction requiring the agency to process the records on an expedited schedule.  *Id.* at 34.

But *American Immigration Council* is ultimately no help for CREW.  Compared to the request there, CREW's is far more limited.  To reiterate, that measles-focused request seeks only information about how CDC handled the non-release of a single report that the public already knows about.  Thus, the harm resulting from non-expedited production in *American Immigration Council* was both less speculative and greater than the harm that CREW argues will occur here.  At any rate, the reasoning in that case seems to be "inconsistent with the conclusion in *New York Times* and with other cases" addressing irreparable harm.  *Heritage Found.*, 2023 WL 2954418, at *5.  To the extent that it is, "the weight of district precedent"—and the nature of irreparable harm in the FOIA context—"suggest[s] that the sounder approach is to require a specific event or time

13

period after which the information will lose significant value." *Id.*

Switching gears, CREW also contends that its requests for records about the overhaul of HHS's FOIA offices are time-sensitive enough to show irreparable harm. Its theory here is that the "dismantling of HHS's transparency infrastructure" is "part of the DOGE [Reduction-In-Force] Initiative," which is "unfolding rapidly." ECF No. 13-1 at 44. So the "window" to inform the public and contribute to "ongoing debates" is "closing." *Id.* And as CREW sees things, "emergency relief" is the only way to "timely inform[]" the public. *Id.* at 44–45 (citing *Citizens for Resp. and Ethics in Wash. v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 WL 752367 (D.D.C. Mar. 10, 2025) ("*CREW v. DOGE*")).

Not so. Nothing prevents CREW from informing the public debate by following "the ordinary litigation process." *Zorn*, 2025 WL 35929, at *3. A bald representation that CREW needs to give the information to the public now so that it can "meaningfully participate in ongoing debates" does not satisfy CREW's heavy burden. ECF No. 13-1 at 44. Instead, CREW must explain *why* that could not happen down the road. But it has not shown that these debates are time-sensitive, mainly because HHS's "dismantling" of the CDC FOIA office is not irreversible. *Id.* The closure of that office, after all, has already happened as part of HHS's FOIA centralization. OS-FOIA now handles FOIA requests targeting CDC records, and the CDC FOIA office is out of the picture. *See, e.g.*, ECF No. 13-16 ¶¶ 4–5 (CREW's anonymous declarant explaining that CDC FOIA employees were placed on administrative leave and "lost access to CDC computer systems"); Holzerland Supp. Decl. ¶ 22 ("OS-FOIA has access to the former CDC-FOIA database, its tracking system, and former CDC-FOIA email addresses, and is currently synthesizing the existing former CDC-FOIA workload"). Because that ship has sailed, public discourse—whether or not informed by the requested records—could not *prevent* the alleged dismantling from occurring.

Of course, public debate could *reverse* HHS's restructuring and restore the CDC FOIA office. But "[p]ublic critique[] of how" HHS "handled" the FOIA overhaul—the kind of debate that could affect HHS's FOIA operations—has "no expiration date." *Heritage Found.*, 2023 WL 2954418, at *5. That holds true even though CREW "may prefer to levy" the critiques "as expeditiously as possible." *Id.* And if anything, these criticisms might gain more traction later. Should CREW prove correct that OS-FOIA cannot effectively integrate the FOIA workloads of CDC and other HHS components, then the "debates about the[] legality" of HHS's actions would be as relevant as ever. ECF No. 13-1 at 45. Put a bit differently, if HHS creates a record of non-compliance with FOIA in the wake of the restructuring—or dismantling, as CREW would have it—then the public will be able to debate those actions. In the end, CREW has "failed to identify a time frame in which the requested information would no longer be valuable." *Long v. DHS*, 436 F. Supp. 2d 38, 44 (D.D.C. 2006).

*CREW v. DOGE* does not change this result. In that case, Judge Cooper found that CREW failed to show that it would suffer irreparable harm without date-certain production of records about DOGE's "role in spearheading the mass firings." 2025 WL 752367, at *1, *10. But CREW *would* suffer such a harm, Judge Cooper explained, without expedited processing. *See id.* at *14–15. Still, what helped CREW make that showing in that case is missing here.

For one thing, the FOIA requests in *CREW v. DOGE* were unquestionably "highly probative, or even essential to the integrity, of" an ongoing debate of national importance. *N.Y. Times*, 2021 WL 1614817, at *8. Those requests sought, among other DOGE-related records, communications between DOGE-affiliated individuals and "personnel of *any federal agency*" about staffing cuts. *CREW v. DOGE*, 2025 WL 752367, at *4 (emphasis added). So those records implicated "high-profile government" action, *id.* at *13–14, in a way that CREW's more limited requests here

15

do not.  Recall once more the scope of those requests: (1) communications about the decision to place the staff of the CDC FOIA office on administrative leave, and (2) records detailing CDC's plans to handle FOIA requests moving forward, including its "plan to take down its FOIA portal website" and send "automated email[s]."  ECF No. 13-8 at 2; ECF No. 13-5 at 2; *see also* ECF No. 13-6 at 2; ECF No. 13-7 at 2.  Simply put, this case about folding one HHS component agency's FOIA office into another does not involve requests for records addressing government action of "the highest national concern."  *CREW v. DOGE*, 2025 WL 752367, at *14.  And CREW cannot bootstrap irreparable harm by claiming that its requests for "specific records" about the CDC FOIA office tangentially "touch[]" on the "broader topic" of DOGE's actions across the federal government.  *Heritage Found.*, 2024 WL 4607501, at *7 (rejecting argument that "[a]ny sub-issue related to a general topic in the headlines" becomes "a matter of great controversy" (citation omitted)).

For another, the facts in *CREW v. DOGE* suggested that responsive records would "not be released anytime soon, if ever," without preliminary relief.  2025 WL 752367, at *14.  DOGE was "not currently processing" the "request because" DOGE thought that it was exempt from FOIA altogether.  *Id.*  Litigating that threshold question and *then* starting "processing would likely result in a substantial delay of years," which might render the requested information "stale."  *Id.*  So like the other cases without a specific imminent event, external factors beyond the mere importance of the information supported irreparable harm and showed that an "ongoing public" debate of "vital national importance" could not "be restarted or wound back."  *Id.* (citation omitted).  CREW points to nothing like that here.  To be sure, CREW is frustrated that Defendants have not supplied a timeline for responding to its FOIA requests through the new centralized OS-FOIA system.  And that frustration is especially understandable because HHS appears to have given little thought to

16

how the restructuring process would affect its ability to respond to outstanding FOIA requests. But problems with delayed FOIA production and unclear processing schedules are, regrettably, not unusual for FOIA requesters.  So while those potential deficiencies and statutory non-compliance may help CREW win on the merits, they do not establish irreparable harm.

CREW tries to loop in the plight of other "repeat CDC FOIA requesters" in one last attempt to salvage this theory, but that argument stumbles too.  ECF No. 13-1 at 45.  To start, CREW cannot rely on "injuries to third parties" to support "irreparable harm." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018).  That problem aside, these requesters could not establish irreparable harm by pointing to their "need to know," for resource-allocation purposes, whether FOIA will "be a functional tool" for obtaining information from CDC.  ECF No. 13-1 at 46.  It is far from clear how the requested records would help CREW (or anyone else) inform these other requesters about the viability of HHS's FOIA overhaul.  Time and again, CREW insists that HHS will not capably respond to CDC requests through OS-FOIA, so CREW could sound the alarm now and help others reallocate resources to avoid this purported injury.  *See, e.g., id.* at 9 ("CDC's statutorily mandated FOIA operations have come to a halt."); ECF No. 20 at 7 ("Defendants by their own admission cannot fulfill [CDC's] basic obligations under [FOIA].").  But such a vague "desire to allocate resources" elsewhere if these requesters somehow confirm that FOIA requests for CDC records will be a dead end is hardly a "cognizable injur[y]"—and certainly not an irreparable one.  *Cf. Nat'l Ass'n for Latino Cmty. Asset Builders v. CFPB*, 581 F. Supp. 3d 101, 108 (D.D.C. 2022).  Organizations must constantly decide how to best use their resources.  But marginal uncertainty about how to do so, at least in this case, is not an irreparable harm.[3]

---

[3] If CREW implicitly includes itself as one of "these stakeholders," ECF No. 13-1 at 46, then this theory of irreparable harm to it fails for the same reasons.

17

### B. CREW Will Not Suffer Irreparable Harm Based on HHS's Overhaul of FOIA Operations

CREW's second theory focuses on harm to its organizational mission. That mission, CREW explains, "depends on FOIA." ECF No. 13-1 at 46. More precisely, CREW "frequently rel[ies] on government records obtained through FOIA" to "disseminat[e] information to the public" and, in doing so, to help citizens know what government officials and agencies are up to. *Id.* at 46–47. Because CREW says that it cannot do that if Defendants "refus[e] to comply with FOIA," it needs preliminary relief to avoid severe harm to its organizational mission. *Id.* at 48. But this argument falters for two reasons. To begin, CREW has not shown that Defendants' actions will significantly impede its organizational mission such that its injury is both "certain and great." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted). But even if it had, CREW has not shown that any such injury is "beyond remediation"; even a "substantial injury," after all, must also be "*irreparable*" to justify a preliminary injunction. *Id.* (citation omitted). Purported harm to an organizational mission is not a hall pass permitting plaintiffs to bypass the usual yet demanding requirements for obtaining that extraordinary relief.

The first problem is straightforward: CREW's mission is to inform citizens "about the activities of government officials and agencies" generally, not those of CDC specifically. *See* Goldstein Decl. ¶ 2. As evidence of its history of submitting FOIA requests to CDC, CREW's declarant cited what appear to be four requests from 2020. *See id.* ¶ 4 n.1. Counsel for CREW clarified that it has "submitted 33 requests to HHS" since 2020 and suggested that "about half of them have gone to CDC." Hearing Tr. at 22–23. CREW also asserts that it "intends to submit additional requests to CDC in the future," Goldstein Decl. ¶ 4, and it has submitted two more requests for CDC records after briefing concluded in this case, *see* ECF No. 26-2 ¶¶ 3, 20. Even so, if HHS's FOIA overhaul closes the pipeline for FOIA requests seeking CDC records, CREW—because its

18

mission is so broad—has not shown that such a cutoff would "*severely* restrict[] CREW's ability to fulfill [that] mission." ECF No. 13-1 at 48 (emphasis added). CREW is not a CDC-specific oversight organization (as shown by its modest number of CDC FOIA requests), nor is it even focused on public health generally. So it is a stretch to say that losing FOIA as a tool to obtain CDC records would significantly harm CREW's sweeping organizational mission. By so concluding, the Court neither finds that Defendants have closed off FOIA access to CDC records nor understates how concerning—and potentially unlawful—such a shutdown would be. But on this record, CREW has not shown that its general mission of government oversight would suffer the kind of significant, serious harm required even if it could not effectively use FOIA to request CDC records.

Compounding this problem for CREW is that the record shows that HHS is doing *something* to process FOIA requests as part of its centralization effort. *See, e.g.*, Holzerland Supp. Decl. ¶¶ 7–12, 19, 22 (describing, among other things, HHS's efforts to integrate the "CDC-FOIA workload"). To be sure, those efforts may prove inadequate for any number of reasons, including that OS-FOIA might lack the expertise, the staff, or the technology to handle CDC's FOIA workload in a way that complies with the statute. But CREW exaggerates when it says that "Defendants have established *no* alternative system to receive and process FOIA requests." ECF No. 13-1 at 47. The record at this point shows that *a* system—a centralized operation through OS-FOIA—exists, even if it turns out to be a bad (or possibly unlawful) one. *See* Holzerland Supp. Decl. ¶¶ 7–12, 17–20, 22–25. Because these shortcomings mean that CREW has not shown a "certain and great" injury to its organizational mission, it fails to establish a prerequisite to preliminary-injunctive relief. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (citation omitted).

Even if the likely harm to CREW's organizational mission were great and certain, however,

it would still not be irreparable in the sense that it could not be remedied later—also a requirement for a preliminary injunction. CREW's main case illustrates this point. In *League of Women Voters of United States v. Newby*, 838 F.3d 1, 4 (D.C. Cir. 2016), an election commission approved requests by several states to add proof-of-citizenship requirements to voter-registration forms. That action, the Circuit found, harmed the organization's ability to accomplish its "primary mission of registering voters." *Id.* at 9. And this injury was "irreparable" not for that reason alone, but "because after the registration deadlines for" an imminent "election pass, there can be no do over and no redress." *Id.* (internal quotation marks and citation omitted). By contrast, CREW can point to nothing like the looming election in *Newby* that would make any harm to its organizational mission irremediable "in the ordinary course of litigation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (citation omitted). So it has not identified the kind of injury to its mission—no matter how significant—that would warrant preliminary relief.

### IV.  Conclusion

For all these reasons, CREW has not shown a likelihood that it will suffer irreparable injury without the injunctive relief that it requests. Thus, the Court will deny CREW's Motion for a Preliminary Injunction, ECF No. 13. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: June 4, 2025