**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,**

Plaintiff,

v.

**U.S. CENTERS FOR DISEASE
CONTROL AND PREVENTION,** *et al.*,

Defendants.

Civil Action No. 25-01020 (TJK)

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PARTIAL CROSS-MOTION FOR SUMMARY JUDGMENT AND
MOTION TO DISMISS WITH A MEMORANDUM OF LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARDS ................................................................................................. 2

ARGUMENT ............................................................................................................... 3

    I.    CREW Is Entitled to Summary Judgment on Its Claim in Count II that Defendants'
        Closure of the CDC FOIA Office Amounts to an Impermissible Policy or Practice ......... 3

        A.    Defendants' Concessions Support Granting Summary Judgment in
               CREW's Favor and Denying Defendants' Cross-Motions ........................................ 3

        B.    Defendants Fail to Moot or Rebut CREW's Showing or Otherwise Show
               They Are Entitled to Any Relief .............................................................................. 11

    II.    CREW Has Stated a Viable APA Claim in Count III and Is Entitled to Summary
        Judgment on that Claim ........................................................................................... 22

        A.    CREW Has Standing to Raise Its APA Claim ........................................................ 22

        B.    FOIA Does Not Preclude CREW's APA Claim ...................................................... 25

        C.    CREW's APA Claim Challenges Final Agency Action ........................................... 29

        D.    Defendants' Closure of the CDC FOIA Office Violates Their Binding Agency
               Regulations and Is Thus Contrary to Law Under the APA ..................................... 33

             1.    The Plain Text of the HHS FOIA Regulations Does Not Authorize
                   the CDC FOIA Office Closure ...................................................................... 34

             2.    Defendants' Efforts to Circumvent the Plain Text Fail ................................. 38

             3.    Defendants' Revocation of Delegated Authority Is Immaterial .................... 41

             4.    Defendants' Regulatory Interpretation Is Not Entitled to Deference ............ 44

CONCLUSION .......................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*,
  537 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................. 4

*Appalachian Power Co. v. Env't Prot. Agency*,
  208 F.3d 1015 (D.C. Cir. 2000) .............................................................................. 31

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 3

*\*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................... 31

*\*Biden v. Texas*,
  597 U.S. 785 (2022) ......................................................................................... 30, 33

*Brown v. Plata*,
  563 U.S. 493 (2011) ............................................................................................... 17

*Cherokee Nation v. U.S. Dep't of the Interior*,
  643 F. Supp. 3d 90 (D.D.C. 2022) ........................................................................... 3

*\*Ciba-Geigy Corp. v. Env't Prot. Agency*,
  801 F.2d 430 (D.C. Cir. 1986) ............................................................................... 33

*\*Colo. Wild Pub. Lands v. U.S. Forest Serv.*,
  691 F. Supp. 3d 149 (D.D.C. 2023) ........................................................... 11, 12, 16

*Connecticut v. U.S. Dep't of the Interior*,
  363 F. Supp. 3d 45 (D.D.C. 2019) ......................................................................... 33

*\*CREW v. U.S. Dep't of Hous. & Urb. Dev.*,
  415 F. Supp. 3d 215 (D.D.C. 2019) ..................................................................... 9, 22

*CREW v. U.S. Dep't of Just.*,
  846 F.3d 1235 (D.C. Cir. 2017) ..................................................................... 24-26, 28

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  766 F. Supp. 3d 39 (D.D.C. 2025) ..................................................................... 30, 32

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
  438 U.S. 59 (1978) ............................................................................................ 23-24

*Edmonds v. Fed. Bureau of Investigation*,
  417 F.3d 1319 (D.C. Cir. 2005) ............................................................................... 4

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health &
   Hum. Servs., 396 F.3d 1265 (D.C. Cir. 2005) ..........................................................29

Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.,
   416 F. Supp. 2d 30 (D.D.C. 2006) ........................................................................4

Elec. Priv. Info. Ctr. v. Internal Revenue Serv.,
   261 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................26

Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury,
   498 F. Supp. 2d 150 (D.D.C. 2007) ....................................................................24

Fed. Bureau of Investigation v. Fikre,
   601 U.S. 234 (2024) ............................................................................................12

Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,
   460 F.3d 13 (D.C. Cir. 2006) ..............................................................................30

Gatore v. U.S. Dep't of Homeland Sec.,
   327 F. Supp. 3d 76 (D.D.C. 2018) ........................................................................3

Greenpeace, Inc. v. U.S. Dep't of Homeland Sec.,
   311 F. Supp. 3d 110 (D.D.C. 2018) ....................................................................26

Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,
   823 F.2d 608 (D.C. Cir. 1987) ............................................................................31

Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.,
   219 F. Supp. 2d 20 (D.D.C. 2002) ......................................................................30

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.,
   895 F.3d 770 (D.C. Cir. 2018) .................................................... 5, 11, 13, 21-22

*Kisor v. Wilkie,
   588 U.S. 558 (2019) ......................................................................................44, 45

Kowalski v. Tesmer,
   543 U.S. 125 (2004) ............................................................................................23

*Leopold v. U.S. Dep't of Def.,
   752 F. Supp. 3d 66 (D.D.C. 2024) ......................................................................14

*Lujan v. Defs. of Wildlife,
   504 U.S. 555 (1992) ....................................................................................22-23, 31

Lujan v. Nat'l Wildlife Fed'n,
   497 U.S. 871 (1990) ........................................................................................30-31

*Mahoney v. U.S. Capitol Police Bd.*,
No. 21-cv-2314-JEB, 2024 WL 4235429 (D.D.C. July 31, 2024) .........................................24

*Marino v. Drug Enf't Admin.*,
685 F.3d 1076 (D.C. Cir. 2012) ...............................................................................................19

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
785 F. Supp. 3d 68 (D. Md. 2025) ............................................................................................32

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ...............................................................................................................33

*Mo. Coal. for the Env't v. U.S. Army Corps of Eng'rs*,
369 F. Supp. 3d 151 (D.D.C. 2019) ............................................................................ 11-12, 16

*Muckrock, LLC v. Cent. Intel. Agency*,
300 F. Supp. 3d 108 (D.D.C. 2018) ....................................................................................9, 16

*Muttitt v. U.S. Central Command*,
813 F. Supp. 2d 221 (D.D.C. 2011) ................................................................................... 27-28

*N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*,
962 F.3d 541 (D.C. Cir. 2020) .................................................................................................24

*Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*,
752 F.3d 999 (D.C. Cir. 2014) .................................................................................................41

*Nat'l Ass'n of Waterfront Emps. v. Chao*,
587 F. Supp. 2d 90 (D.D.C. 2008) ...........................................................................................27

*Nat'l Treasury Emps. Union v. Vought*,
149 F.4th 762 (D.C. Cir. 2025) ................................................................................................33

*New York v. Kennedy*,
No. 25-cv-196, 2025 WL 1803260 (D.R.I. July 1, 2025)........................................................23

*Newman v. Fed. Energy Regul. Comm'n*,
27 F.4th 690 (D.C. Cir. 2022) .................................................................................................44

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)............................................................................................................ 30-31

*Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*,
113 F.4th 943 (D.C. Cir. 2024) ...............................................................................................35

*Padula v. Webster*,
822 F.2d 97 (D.C. Cir. 1987) ...................................................................................................34

*Payne Enters., Inc. v. United States*,
  837 F.2d 486 (D.C. Cir. 1988) ..............................................................9, 11, 13, 16

*Rachel v. Troutt*,
  820 F.3d 390 (10th Cir. 2016) ...........................................................................19

*Radack v. U.S. Dep't of Just.*,
  402 F. Supp. 2d 99 (D.D.C. 2005) ......................................................................27

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012).............................................................................................41

*Roberts v. Internal Revenue Serv.*,
  No. 8:13-cv-1731-T-33TBM, 2014 WL 1724383 (M.D. Fla. Mar. 17, 2014) .......27

*S. Env't L. Ctr. v. Council on Env't Quality*,
  446 F. Supp. 3d 107 (W.D. Va. 2020) .................................................................27

*Scott & White Health Plan v. Becerra*,
  693 F. Supp. 3d 1 (D.D.C. 2023) ..................................................................42, 44

*Seeger v. U.S. Dep't of Def.*,
  306 F. Supp. 3d 265 (D.D.C. 2018) .....................................................................34

*Soundboard Ass'n v. Fed. Trade Comm'n*,
  888 F.3d 1261 (D.C. Cir. 2018) ..........................................................................40

*Thunder v. U.S. Parole Comm'n*,
  133 F. Supp. 3d 5 (D.D.C. 2015) .........................................................................40

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025)..........................................................................................33

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016).........................................................................................31-32

*United States v. Libby*,
  429 F. Supp. 2d 27 (D.D.C. 2006) ................................................................40, 44

*United States v. Tilghman*,
  134 F.3d 414 (D.C. Cir. 1998) ............................................................................17

*Valancourt Books, LLC v. Garland*,
  82 F.4th 1222 (D.C. Cir. 2023) ...........................................................................12

*Wannall v. Honeywell, Inc.*,
  775 F.3d 425 (D.C. Cir. 2014) ..............................................................................4

*West Virginia v. Env't Prot. Agency,*
     597 U.S. 697 (2022) ........................................................................................41

*Whitman v. Am. Trucking Ass'ns,*
     531 U.S. 457 (2001) ...................................................................................30, 41

*Wiley v. Kennedy,*
     No. 25-cv-00227, 2025 WL 1384768 (S.D.W. Va. May 13, 2025) .......................32

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n,*
     82 F.4th 1273 (D.C. Cir. 2023) .........................................................................34

**Statutes**

5 U.S.C. § 551(13) ................................................................................................30

*5 U.S.C. § 552 ............................................................................................ *passim*

OPEN Government Act,
     Pub. L. No. 110-175, § 10, 121 Stat. 2524 (2007) ...............................................42

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................3

Fed. R. Civ. P. 12(b)(6) ............................................................................................3

Fed. R. Civ. P. 56(c) .................................................................................................2

Fed. R. Civ. P. 56(e) .................................................................................................2

**Executive Orders and Regulations**

*45 C.F.R. § 5.2(b) ..................................................................................................24

*45 C.F.R. § 5.3 .......................................................................................... *passim*

45 C.F.R. § 5.21 ....................................................................................................22

52 Fed. Reg. 43,575, 43,581-82 (Nov. 13, 1987) ......................................................37

81 Fed. Reg. 39,003, 39,004 (June 15, 2016) .....................................................37, 42

Exec. Order 13,392, 70 Fed. Reg. 75,373 (Dec. 19, 2005) .........................................42

**Other Authorities**

*2025 Chief FOIA Officer Report HHS*, HHS (Mar. 10, 2025),
https://www.hhs.gov/foia/statutes-and-resources/officers-reports/2025-intro
duction/index.html ................................................................. 7, 24, 36-37

CDC, *Measles Cases and Outbreaks*,
https://www.cdc.gov/measles/data-research/index.html...........................................1

*Certain*, Cambridge Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/certain .............................35

*Certain*, Collins Dictionary,
https://www.collinsdictionary.com/dictionary/english/certain ...............................35

*Certain*, Oxford English Dictionary,
https://www.oed.com/dictionary/certain_adj?tab=factsheet#9732757 ...................35

*Chief Freedom of Information Act (FOIA) Officer Reports,* HHS (2011),
http://web.archive.org/web/20130614133005/http://www.hhs.gov/foia/
reference/step2.html[1] ................................................................36

Compl. for Decl. & Inj. Relief, *Henry J. Kaiser Family Foundation et al. v. HHS
et al.*, No. 25-cv-02742-DLF (D.D.C. Aug. 19, 2025), ECF No. 1 .........................10

Erica R. Hendry, *WATCH: Ousted CDC Director Monarez's Opening Statement
in Senate Hearing on RFK Jr., Kids' Health*, PBS News (Sept. 17, 2025),
https://perma.cc/P4SY-8HL4...............................................................1

*FOIA Advisory Committee Recommendations*, Off. of Gov't Info. Servs., FOIA
Advisory Comm., https://www.archives.gov/ogis/foia-advisory-committee/
recommendations .........................................................................13

*Guidance on Backlog Reduction Plans*, U.S. Dep't of Just. Off. of Info. Policy
(Aug. 21, 2025), https://www.justice.gov/oip/oip-guidance/guidance-backlog-
reduction-plans...........................................................................13

---

[1] HHS Chief FOIA Officer Reports and Annual Reports from before 2022 are not accessible on HHS's website; the links to the pre-2022 reports on HHS's webpages for the reports (available at https://www.hhs.gov/foia/statutes-and-resources/officers-reports/index.html and https://www.hhs.gov/foia/reports/annual-reports/index.html) are broken.  They are not accessible through the Internet Archive, a nonprofit that archives Internet webpages. *See About the Internet Archive*, Internet Archive, https://archive.org/about/.  But the Department of Justice's Office of Information Policy has an archive of agency Chief FOIA Officer Reports and Annual Reports (available at https://www.justice.gov/oip/reports-1).  The links for HHS reports in this archive appear to be broken as well, but they are accessible using the Internet Archive and cited in this brief.

*HHS Fiscal Year 2024 Freedom of Information Annual Report*, HHS (Feb. 21, 2025), https://www.hhs.gov/foia/reports/annual-reports/2024/index.html...........................7-8

*HHS Fiscal Year 1998 Freedom of Information Annual Report,* HHS, http://web.archive.org/web/20130607023955/http://www.hhs.gov/foia/98anlrpt.html..............................................................................................................36

Joint Status Rep., *Bloomberg L.P. v. CDC et al.*, No. 24-cv-3343 (D.D.C. July 29, 2025), ECF No. 17 ............................................................................................6

Joint Status Rep., *Informed Consent Action Network v. CDC et al.*, No. 25-cv-1331 (Aug. 20, 2025), ECF No. 13...................................................................6

Lena H. Sun *et al.*, *As CDC Crumbles, Fears Grow About Vaccines, Pandemics*, The Wash. Post (Sept. 24, 2024), https://perma.cc/P4SY-8HL4 ...............................1

Lena H. Sun, *More than 1,000 CDC Staff Receive Layoff Notices During Government Shutdown*, The Wash. Post (Oct. 11, 2025), https://perma.cc/LW9N-DAP5 ..........................................................................1

*U.S. Department of Health and Human Services (HHS) Chief Freedom of Information Act (FOIA) Officer Report*, HHS (Mar. 15, 2010), http://web.archive.org/web/20130607023958/http://www.hhs.gov/foia/final_chief_foia_officer_rpt.pdf.....................................................................................36

## INTRODUCTION

The U.S. Centers for Disease Control and Prevention ("CDC") is in crisis. Its director was fired less than a month after being sworn in, apparently for refusing to submit to demands by Department of Health and Human Services ("HHS") Secretary Robert F. Kennedy Jr. to pre-approve vaccine recommendations and fire career scientists.[2] This leadership turmoil comes after many months of upheaval at the agency, during which it has slashed billions of dollars in funding and fired hundreds of vital public health employees.[3] All the while, measles and other infectious diseases continue to surge,[4] and the agency's vaccine policy is in flux. Now, more than ever, transparency at our country's leading public health agency is key; the American people need the CDC to have an operational Freedom of Information Act ("FOIA") office and function.

Defendants apparently disagree—mounting a variety of arguments to justify their abrupt closure of the CDC FOIA office and transfer of its responsibilities to an ill-equipped HHS one. Defs.' Opp. to Pl.'s Mot. for Summ. J. & Partial Cross-Mot. for Summ. J. & Mot. to Dismiss with a Mem. of Law in Supp. Thereof, ECF No. 43 [hereinafter Defs.' Mem.]. None of Defendants' arguments entitles them to dismissal or summary judgment as to CREW's claims.

CREW is entitled to summary judgment on its FOIA policy-or-practice claim because the undisputed facts show that Defendants' closure of the CDC FOIA office has impaired and will impair CREW's lawful access to CDC records. CDC FOIA functions have barely resumed and are unlikely to ramp up anytime soon, more than a half-year after HHS's central FOIA office, OS

---

[2] *See* Erica R. Hendry, *WATCH: Ousted CDC Director Monarez's Opening Statement in Senate Hearing on RFK Jr., Kids' Health*, PBS News (Sept. 17, 2025), https://perma.cc/P4SY-8HL4.

[3] *See* Lena H. Sun *et al.*, *As CDC Crumbles, Fears Grow About Vaccines, Pandemics*, The Wash. Post (Sept. 24, 2024), https://perma.cc/4JEK-JNUV; *see also* Lena H. Sun, *More than 1,000 CDC Staff Receive Layoff Notices During Government Shutdown*, The Wash. Post (Oct. 11, 2025), https://perma.cc/LW9N-DAP5.

[4] CDC, *Measles Cases and Outbreaks*, https://www.cdc.gov/measles/data-research/index.html.

FOIA, took them over; Defendants' paltry showing otherwise fails to persuade.  As Defendants' sole declarant put it in the weeks after the reduction-in-force ("RIF") impacting the CDC FOIA office and other HHS FOIA offices, "there will be widespread, significant service delays across nearly every HHS . . . FOIA program," including because OS FOIA must take on work "far beyond [its] capacity."  Suppl. Decl. of Alex M. Goldstein in Supp. of Pl.'s Mot. for Summ. J. & Opp. to Partial Cross-Mot. for Summ. J. & Mot. to Dismiss ¶ 6 (quoting Holzerland emails) [hereinafter Suppl. Goldstein MSJ Decl.].  The undisputed facts prove him right.

CREW is entitled to summary judgment on its Administrative Procedure Act ("APA") claim because Defendants violated the plain language of their FOIA regulations when they closed the CDC FOIA office.  Defendants' contrary reading ignores the plain text and all the other traditional tools of interpretation, and the other arguments they raise to forestall the Court from even reaching this question do not pass muster.  As an affected CDC FOIA requester, CREW has standing to challenge Defendants' regulatory violation.  That violation is exactly the stuff of an APA claim, rather than a FOIA one, because it concerns the legality of Defendants' restructuring decision itself and not the downstream consequences of that decision on FOIA compliance.  And the decision is final agency action because it reflects Defendants' consummated decision-making and affects CREW and all others wishing to obtain CDC records.

## LEGAL STANDARDS

CREW's opening brief explained the summary-judgment standard.  *See* Corrected Mem. in Supp. of Pl.'s Mot. for Summ. J. 13-14, ECF No. 35-1 [hereinafter Pl.'s Mem.].  CREW simply adds two points here that bear on Defendants' cross-motion.  First, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed . . . ."  Fed. R. Civ. P. 56(e).  Second, agency "affidavits are not sufficient if called into question by contradictory evidence in the

record." *Gatore v. U.S. Dep't of Homeland Sec.*, 327 F. Supp. 3d 76, 97 (D.D.C. 2018) (quotation marks omitted), *aff'd*, No. 21-5148, 2023 WL 2576176 (D.C. Cir. Mar. 21, 2023).

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must prove subject-matter jurisdiction by a preponderance of the evidence. *See Cherokee Nation v. U.S. Dep't of the Interior*, 643 F. Supp. 3d 90, 103 (D.D.C. 2022). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "state a claim to relief" in its complaint "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As discussed below, CREW has satisfied both standards.

## ARGUMENT

## I.    CREW Is Entitled to Summary Judgment on Its Claim in Count II that Defendants' Closure of the CDC FOIA Office Amounts to an Impermissible Policy or Practice

Defendants address CREW's policy-or-practice claim in just a handful of pages at the end of their brief. *See* Defs.' Mem. 38-45. Defendants' short response fails to overcome or otherwise rebut CREW's substantial showing in support of its claim. *See* Pl.'s Mem. 20-36.

### A.    Defendants' Concessions Support Granting Summary Judgment in CREW's Favor and Denying Defendants' Cross-Motions

To begin, Defendants concede critical aspects of CREW's showing:

a.    Defendants admit that they have responded to multiple of CREW's April 1 CDC FOIA requests with acknowledgment letters stating that OS FOIA "automatically" is entitled to 10 more business days to respond because the requests seek records "which require a search in another office" and "unusual circumstances" under FOIA thus "apply." Defs.' Counter-Statement of Disputed Material Facts ¶¶ 33, 35, ECF No. 43-1 [hereinafter Defs.' Counter SOMF]; *see* Pl.'s Mem. 12-13, 27. This concession is unsurprising. Since these acknowledgment letters, Defendants have sent several more, in response to standard and expedited FOIA requests for CDC records, with the same language. *See* Suppl. Goldstein MSJ Decl. ¶¶ 10-12 & n.4, 14-16.

Defendants' position is damning. As CREW has already explained, it defies reason for OS

FOIA to claim it necessarily gets 10 extra business days on top of FOIA statutory deadlines—and, apparently, on top of the post-deadline time it takes to belatedly send acknowledgment letters—simply because CDC FOIA requests require it to search for records at CDC, a separate "office" from OS FOIA and HHS. *See* Pl.'s Mem. 28. That is not an "unusual circumstance"; that is a circumstance *entirely* of Defendants' own making, and it is *precisely* the design of their FOIA reorganization. *See id.* No one forced Defendants to do away with the CDC FOIA office. And no one forced them to do so without the advanced planning or infrastructure in place to ensure that OS FOIA could, as a central and separate office, handle CDC FOIA requests in accordance with FOIA's ordinary deadlines for both standard and expedited requests.[5] Their foolhardy decision-making does not "automatically" entitle them to blow past these deadlines for CDC FOIA requests—let alone to more time *after* deadlines have passed. *See id.* at 28, 44-45; Suppl. Goldstein MSJ Decl. ¶¶ 12, 16. Tellingly, Defendants offer no response, forfeiting any argument they could raise. *See, e.g.*, *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014); *Aleutian Pribilof Islands Ass'n, Inc. v. Kempthorne*, 537 F. Supp. 2d 1, 12 n.5 (D.D.C. 2008).

Any argument Defendants could belatedly muster up surely fails. Their automatic ten-day extension ploy for CDC FOIA requests—on the ground that those requests present the "unusual circumstance" that OS FOIA must reach beyond HHS and into CDC—is the crystallization of their policy-or-practice violation. By their own words, they cannot timely handle CDC FOIA requests

---

[5] Defendants' position is particularly damning for expedited requests, for which FOIA requires agencies to issue determinations within 10 calendar days rather than 20 business days. *Compare* 5 U.S.C. § 552(a)(6)(E)(i), *with id.* § 552(a)(6)(A)(i). The faster timeline reflects "Congress' recognition of the value in hastening release of certain information." *Edmonds v. Fed. Bureau of Investigation*, 417 F.3d 1319, 1324 (D.C. Cir. 2005); *see Elec. Priv. Info. Ctr. ("EPIC") v. Dep't of Just.*, 416 F. Supp. 2d 30, 40 (D.D.C. 2006). Defendants' position casts aside this considered judgment. It also invents an extension for expedited requests that Congress did not provide. *See* 5 U.S.C. § 552(a)(6)(B)(i) (specifying extension only of 20-business-day deadline for standard requests and appeals).

from the get-go because of their new FOIA design, and by default must extend FOIA deadlines for them. The D.C. Circuit has forcefully instructed that such illicit and unreasonable delay tactics are exactly the domain of a policy-or-practice claim. *See Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 779-80 (D.C. Cir. 2018) (explaining that "failures to adhere to FOIA's pre-litigation requirements, including response deadlines," are actionable policy-or-practice violations, since agencies cannot flout "FOIA's mandate of 'prompt' response[s]"); *see also id.* at 780-82 (explaining agencies cannot "adopt[] a practice of delay" that enables them to inexplicably and repeatedly fail to make non-exempt records available and stand mute).

    **b.**    Defendants concede they did not offer advanced notice or explanation of their April 1 closure of the CDC FOIA office. All they point to is their March 27 announcement that they would be streamlining various HHS divisions "in compliance with" the DOGE RIF Order. Defs.' Counter SOMF ¶ 8. That broad announcement did not indicate that FOIA functions at CDC or other HHS divisions would be cut. In other words, Defendants concede they did not offer any warning that the CDC FOIA office would be closed, or any information about how requesters should obtain CDC records going forward. Defendants also do not provide any indication their decision resulted from prior planning and analysis—not to mention planning and analysis that considered the workload, resource, technical, and logistical factors necessary to pull off their restructuring while abiding by FOIA's terms. Their FOIA leadership was completely in the dark. As Defendants' own declarant admitted after the April 1 RIF, he "received zero advance notice," lacked specifics on the status of HHS components' FOIA programs, and needed to "get clarity" on the path forward. Suppl. Goldstein MSJ Decl. ¶¶ 6-8 (quoting Holzerland emails).

    **c.**    Defendants also admit that they did not even begin "work[ing]" on CDC FOIA requests until May 21, 2025, Defs.' Mem. 40 (citing Fourth Holzerland Decl. ¶ 28)—nearly two

months after the CDC FOIA office closure, and nearly a month after they assured the Court they were properly handling FOIA responsibilities and would continue to do so, *see* Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. 14, 21, ECF No. 18; *see also* May 13, 2025 Hr'g Tr. at 41, ECF No. 23.

      **d.**    Defendants represent that they continue to experience technical issues. *See* Defs.' Counter SOMF ¶¶ 45, 47, 68; Fourth Holzerland Decl. ¶ 11 (explaining they cannot disable CDC web submission system and that only "as of September 3," "once the performance period" for the OS FOIA system ended, did they ensure that CDC requests submitted through FOIA.gov are being "automatically routed" to OS FOIA). Moreover, Defendants concede facts directly contrary to their representations that they gained access to CDC FOIA systems (*i.e.*, its database, tracking system, and email addresses) and resolved technical issues as of May 6. *See* Pl.'s Mem. 22; Defs.' Mem. 6 (citing Third Decl. of William H. Holzerland ¶ 9, ECF No. 38-1 (similar) [hereinafter Third Holzerland Decl.]); Defs.' Counter SOMF ¶¶ 27, 43-44, 46; Fourth Holzerland Decl. ¶ 13.

      Defendants admit, per their representations in other cases, that they have continued to face basic systems and records access issues after May 6. *See* Pl.'s Mem. 25-27 (identifying May 12, June 6, and June 20 joint status reports in other cases); Defs.' Counter SOMF ¶¶ 52-53 (admitting to these facts). Additional representations, made since CREW filed its opening brief, reinforce these issues. *See* Joint Status Rep. at 1, *Informed Consent Action Network v. CDC et al.*, No. 25-cv-1331 (Aug. 20, 2025), ECF No. 13 (explaining OS FOIA was still "unable to obtain access to" potentially responsive records on CDC drive); Joint Status Rep. at 1-2, *Bloomberg L.P. v. CDC et al.*, No. 24-cv-03343 (D.D.C. July 29, 2025), ECF No. 17 (explaining that OS FOIA was still "in the process of transitioning records from" CDC FOIA system); *see also* Suppl. Goldstein MSJ Decl. ¶¶ 26-28 (noting that HHS and CDC FOIA web portals are not currently functioning).

      **e.**    Defendants do not dispute that OS FOIA faces a massive workload after it

consolidated the FOIA work not just of CDC but also multiple other HHS components.  *See* Defs.'

Counter SOMF ¶¶ 49-50 (admitting OS FOIA consolidation of offices' work); Defs.'

Statement of Material Facts Not in Dispute ¶ 10, ECF No. 44-1 (same) [hereinafter Defs.' SOMF];

Defs.' Counter SOMF ¶¶ 48, 58, 60 (admitting pending request numbers as of May 1, and failing

to controvert other statistics sourced from Defendants).  OS FOIA recently represented to CREW

that it had 7,000 cases.  *See* Decl. of Alex M. Goldstein in Supp. of Summ. J. ¶ 4, ECF No. 33-2

[hereinafter Goldstein MSJ Decl.].  In its latest declaration, it represents that it has "nearly 9,315

pending FOIA requests, approximately 640 pending FOIA appeals, and 262 pending FOIA

consults." Fourth Holzerland Decl. ¶ 92; *see Create a Quarterly Report*, FOIA.gov, https://www.

foia.gov/quarterly.html (a search for HHS-OS FOIA shows that it has 8,787 backlogged requests

as of Q3 2025).  Defendants' declarant expressed concerns in the days after the April 1 RIF about

how the RIF would affect OS FOIA's substantial backlog, how the office "was barely keeping up"

with its existing work, and how "shuttling [CDC] requesters" to the office would "add a layer of

confusion" and be "suboptimal."  Suppl. Goldstein MSJ Decl. ¶ 7 (quoting Holzerland emails).

  **f.** Defendants also do not dispute that, to do all this mounting work, they have

extremely limited and shrinking OS FOIA resources.  *Id.* (quoting Holzerland email explaining

that "[r]esources are severely limited").  They admit that OS FOIA has lost staff.  *See* Defs.'

Counter SOMF ¶¶ 48, 51.  And they admit that OS FOIA began the 2024 fiscal year with only

*eight* full-time employees and twenty-and-a-half additional contractors, *see id.* ¶ 51—a small

fraction of the 336 total HHS full-time employees "work[ing] full-time on FOIA administration"

before the start of this administration, *2025 Chief FOIA Officer Report HHS*, at Introduction, HHS

(Mar. 10, 2025), https://www.hhs.gov/foia/statutes-and-resources/officers-reports/2025-intro

duction/index.html [hereinafter *2025 Chief FOIA Officer Report*]; *see also HHS Fiscal Year 2024*

*Freedom of Information Annual Report*, HHS (Feb. 21, 2025), https://www.hhs.gov/foia/ reports/annual-reports/2024/index.html (Section IX) [hereinafter *2024 Annual FOIA Report*].

g.      Defendants do not dispute the statistics in their own 2024 annual report showing that OS FOIA already fares poorly compared to other FOIA offices within HHS on several performance metrics.  *See* Pl.'s Mem. 30 (citing Pl.'s Resp. to the Suppl. Decl. of William Holzerland 7, ECF No. 26 [hereinafter PI Suppl. Reply]).  They simply try to contextualize some of them with vague assertions or unrelated data.  *See* Defs.' Counter SOMF ¶¶ 58-59.  But they cannot escape the cold hard facts.  The attached table of Defendants' own data shows that, for nearly a decade and across a range of metrics, OS FOIA has had a flagging FOIA operation when compared to CDC FOIA.  *See* Suppl. Goldstein MSJ Decl. ¶ 25.  This apples-to-apples comparison speaks for itself.

h.      Defendants admit that all CDC requests are being merged into OS FOIA's existing workload, such that pending CDC requesters are now part of a much broader and backlogged FOIA queue, with OS FOIA handling requests on a first-in, first-out basis.  *See* Defs.' Counter SOMF ¶ 57; Defs.' Mem. 39.  CDC FOIA requests that were part of CDC's more streamlined queue are now stuck with and behind others in OS FOIA's considerably longer and growing one, which, as of HHS's most recent annual FOIA report, has requests pending *since* 2016.  *See 2024 Annual FOIA Report*, *supra*, at Section VII.E.  As Defendants' declarant aptly assessed, this design "inevitab[ly]" sets up CDC FOIA requesters for processing delays.  Suppl. Goldstein MSJ Decl. ¶ 6 (quoting Holzerland emails characterizing "service delays" as "an unfortunate inevitability" and stating that "there will be widespread, significant service delays across nearly every HHS . . . FOIA program," including because OS FOIA must take on work "far beyond [its] capacity").

In fact, Defendants concede that CREW has already been impacted.  Defendants admit

that, as of their filing, they still had not issued determinations for any of CREW's April 1 requests, *see* Defs.' Counter SOMF ¶ 36, and that all they could commit to was a plan to "updat[e] [CREW] on or before September 30" about the status of four of its requests and to issue a first interim release for one request, a non-expedited one, by September 15, Fourth Holzerland Decl. ¶¶ 28, 33, 37, 42, 47. Defendants further admit that they did not issue timely acknowledgment or determination letters for CREW's other CDC requests since April 1, *see* Defs.' Counter SOMF ¶¶ 67, 69, which are material because they support its standing, *see* Pl.'s Mem. 16-18, and the merits of its live claim that Defendants' CDC FOIA office closure impairs its "lawful access to information in the future." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988); *see Muckrock, LLC v. Cent. Intel. Agency*, 300 F. Supp. 3d 108, 134 (D.D.C. 2018). CREW's issues continue—more of its CDC requests have been met with silence and delay. *See* Suppl. Goldstein MSJ Decl. ¶¶ 9-19.

     **i.** Defendants also concede that other CDC FOIA requesters are in the same boat. Defendants offer no facts disputing the raft of declarations CREW submitted from other organizations. *See* Pl.'s Mem. 24, 26. For four organizations, the ACLU, the Center for Science in the Public Interest, Knowledge Ecology International, and the White Coat Waste Project, Defendants simply claim that the organizations' experiences are "immaterial" and point to OS FOIA's plan to respond to CREW's April 1 FOIA requests. Defs.' Counter SOMF ¶ 65. But of course the experiences are material—they corroborate CREW's policy-or-practice claim and contradict Defendants' position that their FOIA reorganization is copacetic. *See* Pl.'s Mem. 24 n.26; *see also, e.g.*, *CREW v. U.S. Dep't of Hous. & Urb. Dev.*, 415 F. Supp. 3d 215, 225 (D.D.C. 2019). And of course Defendants' belated plan for handling CREW's April 1 requests says nothing about their ability to handle CREW's other pending and future requests.

For the four other organizations, American Oversight, Democracy Forward, the Sierra Club, and the Union of Concerned Scientists ("UCS"), Defendants offer little more. All Defendants additionally point to is that they finally have issued an acknowledgment letter to American Oversight on one request and plan to issue other ones shortly; they have issued "acknowledgment letters *and/or* tracking numbers" for Democracy Forward's numerous requests; they have issued a belated acknowledgment letter to Sierra Club after four months; and they cannot track down UCS's communications regarding its request. Defs.' Counter SOMF ¶¶ 61-64 (emphasis added); *see also* Fourth Holzerland Decl. ¶¶ 51-54. This is hardly inspiring; belatedly doing the bare minimum for some requests does little to demonstrate an actually functioning FOIA operation. Nor is it sufficient to rebut the organizations' detailed allegations demonstrating that they have had their CDC requests ignored, and improperly handled, for months under OS FOIA's watch. *See* Pl.'s Mem. 24, 26.

The eight organizations' declarations and their supplemental ones submitted herein make clear that all the organizations have been and continue to be stymied by the CDC FOIA shutdown, in the same way CREW has been. Others have joined this growing chorus of affected CDC FOIA requesters. *See* Decl. of Jordan Lassiter ¶¶ 3, 8-10; Decl. of Randy E. Miller ¶¶ 3-8; Decl. of Michael Morisy ¶¶ 4, 8-12, 14-17; Compl. for Decl. & Inj. Relief ¶¶ 27-37, *Henry J Kaiser Family Foundation et al. v. HHS et al.*, No. 25-cv-02742-DLF (D.D.C. Aug. 19, 2025), ECF No. 1.

* * *

In short, the facts embraced by both parties readily demonstrate that CREW is entitled to summary judgment on its policy-or-practice claim, and that Defendants' cross-motions lack merit. Their own admissions demonstrate that they are not exercising "good faith and due diligence" in handling CDC FOIA responsibilities. Defs.' Mem. 38 (quotation marks omitted).

## B.    Defendants Fail to Moot or Rebut CREW's Showing or Otherwise Show They Are Entitled to Any Relief

Set against the backdrop of the undisputed facts, Defendants' arguments are best understood as an effort to moot CREW's policy-or-practice claim.  *See* Reply Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. 10-12, ECF No. 20 [hereinafter PI Reply].  That claim took shape when Defendants shuttered the CDC FOIA office on April 1—leaving themselves without basic access to CDC systems for more than a month, and requesters like CREW in total limbo.  *See id.* at 10; Defs.' Counter SOMF ¶¶ 29, 36, 43-44.  The claim has only strengthened over time as Defendants have struggled mightily to resume basic functionality and take over CDC FOIA office responsibilities.  Now, more than six months after the office closure, Defendants claim that everything is back to business as usual for CDC FOIA requesters, and that they "inten[d] to abide by the terms of . . . FOIA" going forward.  Defs.' Mem. 39.  But their representations fall well short of demonstrating that they have taken "intervening actions" that have "entirely solved the policy problem or cured [CREW]'s ongoing injur[y]."  *Colo. Wild Pub. Lands v. U.S. Forest Serv.*, 691 F. Supp. 3d 149, 172 (D.D.C. 2023); *see, e.g.*, *Payne*, 837 F.2d at 491-92; *Mo. Coal. for the Env't v. U.S. Army Corps of Eng'rs*, 369 F. Supp. 3d 151, 163 n.5 (D.D.C. 2019).

Policy-or-practice claims present an exception to mootness in the FOIA context, where, ordinarily, an agency can moot challenges predicated on specific requests by addressing them. *Payne*, 837 F.2d at 491; *see also, e.g.*, *Jud. Watch*, 895 F.3d at 777.  So long as the plaintiff shows that the agency's initial failure to properly respond to its FOIA requests reflects a "failure to abide by the terms of . . . FOIA"—as CREW has shown here—a policy-or-practice challenge "is not moot" simply because the agency then responds during litigation.  *Payne*, 837 F.2d at 491.

Instead, Defendants face the "heavy burden" of showing that, going forward, they will abide by FOIA's terms and properly handle CREW's CDC FOIA requests. *Colo. Wild Pub. Lands*,

691 F. Supp. 3d at 171-72; *see also Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024). They must prove not only that they have voluntarily ceased the challenged conduct; they must also show "there is no reasonable expectation that the alleged violation will recur" and "interim relief or events have completely or irrevocably eradicated the effects of the alleged violation," *Colo. Wild Pub. Lands*, 691 F. Supp. 3d at 172 (quotation marks omitted); *see also, e.g.*, *Mo. Coal.*, 369 F. Supp. 3d at 163 n.5, and that showing must be "absolutely clear," *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1230 (D.C. Cir. 2023).

Defendants' showing misses the mark. Defendants offer up a series of largely recycled arguments, none of which is persuasive.[6]

  **a.**  Defendants begin by once again touting "benefits" they anticipate will result from "centralizing" CDC FOIA responsibilities within OS FOIA. Defs.' Mem. 40; *see id.* at 5-6, 39, 41. For example, Defendants claim that closing the CDC FOIA office will "allow more efficient use of resources," "simplify[] the customer service process for the public," and "moderniz[e]" FOIA functions. *Id.* at 40-41. These arguments fall flat. As CREW previously identified in the spring, Defendants' centralization pitch consists of bare and speculative assertions of generic benefits; ignores concrete evidence showing that centralization will be, and demonstrably has been, a time-consuming and resource-intensive endeavor; is a solution in search of a problem; flies in the face of real-world practice; and fails to demonstrate *actual* compliance with FOIA's terms and continued CDC FOIA functionality. *See* PI Reply 15-16 & n.6; *see also id.* at 13-14; PI Suppl. Reply 2-3 & n.1, 6; Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. & Partial Summ. J. 7-8, 26, ECF No. 13-1; Pl.'s Mem. 38.

---

[6] Even if considered as an effort to undermine the merits of CREW's claim, Defendants' showing is unpersuasive for all the reasons discussed below.

Defendants cure none of these analytical shortfalls. They give the Court the same spiel on the goals of their FOIA centralization endeavor. Six months into their endeavor, their pitch hardly looks any more compelling. Defendants do not identify any ways in which their anticipated benefits have manifested. Nor can they, given the undisputed facts discussed above. Simply put, Defendants' goals are irrelevant to evaluating CREW's claim. They are illusory. *See also* Suppl. Goldstein MSJ Decl. ¶ 8 (identifying contradictions in Holzerland's views on centralization).[7]

**b.** Defendants' attempt to rely on CDC FOIA processing efforts fares no better. Defendants point both to their processing of CREW's five April 1 requests and their purported processing of other CDC requests to argue that they are "doing *something*" to maintain CDC FOIA functionality and thus can stave off CREW's policy-or-practice claim. Defs.' Mem. 39 (quotation marks omitted); *see id.* at 39-40, 43. But none of their processing efforts suffice.

As the D.C. Circuit has explained, "a party's challenge to the policy or practice cannot be mooted by the release of the specific documents that prompted the suit." *Payne*, 837 F.2d at 491 (footnote omitted); *see Jud. Watch*, 895 F.3d at 777-79. So, Defendants' now apparent "good faith" and renewed "diligence" in handling some of CREW's requests is irrelevant. Defs.' Mem. 44 (quotation marks omitted). In any case, Defendants are still in the midst of processing CREW's April 1 requests. Defendants began searches only at the end of July; their searches remain ongoing for multiple requests; and they have only been able to commit to and make a first set of

---

[7] CREW agrees "[t]here is no requirement that government be ossified and unchanging," and it supports legitimate and lawful reforms to FOIA operations. Defs.' Mem. 6. If Defendants genuinely wanted to improve their FOIA operations, they could have considered a variety of already thought-out and considered proposals. *See, e.g.*, *Guidance on Backlog Reduction Plans*, U.S. Dep't of Just. Off. of Info. Policy (Aug. 21, 2025), https://www.justice.gov/oip/oip-guidance/guidance-backlog-reduction-plans; *FOIA Advisory Committee Recommendations*, Off. of Gov't Info. Servs., FOIA Advisory Comm., https://www.archives.gov/ogis/foia-advisory-committee/recommendations (last visited Oct. 16, 2025).

productions.  *See* Defs.' Counter SOMF ¶¶ 33, 35; Fourth Holzerland Decl. ¶¶ 27-28, 32, 37, 41, 46.  And this belated progress comes only after Defendants sought at the last minute to stay the ongoing dispositive briefing—in a transparent effort to buy themselves more time to process CREW's requests and moot its policy-or-practice claim.  *See* Opp. to Defs.' Mot. to Stay, or, in the Alternative, for Extension of Time to Respond to Pl.'s Am. Compl. & Mot. for Summ. J. 6, 12, ECF No. 39 [hereinafter Stay Opp.].  They have failed.

With CREW's April 1 requests still outstanding, there clearly remains an "ongoing dispute" to resolve.  *Leopold v. Dep't of Def.*, 752 F. Supp. 3d 66, 94 (D.D.C. 2024).  Defendants' belated work fails to demonstrate their ability to abide by statutory deadlines, make CDC records promptly available, and otherwise properly handle CREW's CDC FOIA requests and ensure its lawful access to information going forward.  Especially so when considering the undisputed facts discussed in Part I.A above—namely, that CREW and other CDC FOIA requesters continue to face basic FOIA compliance issues across their requests; that Defendants have admitted that CDC requests present OS FOIA with "unusual circumstances" requiring automatic time extensions; and that Defendants have admitted fundamental workload, resources, and other structural barriers to successfully carrying out CDC FOIA responsibilities in the short-to-medium term.

Defendants' appeals to their other, supposedly robust CDC FOIA processing work since April 1 are similarly unavailing.  They do not substantiate any such work.  As CREW has identified, Defendants have *repeatedly* ducked opportunities to supply proof of *CDC-specific* processing (rather than OS FOIA processing for its own, pre-existing docket).  *See* PI Reply 13, 15; PI Suppl. Reply 3-5, 9-11; Pl.'s Mem. 23.  Their latest bite at the apple is more of the same.

Like before, Defendants continue to generally describe OS FOIA's absorption of the CDC FOIA workload and its typical process for handling FOIA requests on a first-in, first-out basis—

without offering any concrete proof that this typical process is actually playing out for CDC requests. *See* Defs.' Mem. 39; Defs.' Counter SOMF ¶ 27 (generically stating that "the Department is taking actions consistent with its [FOIA] obligations" for new CDC FOIA requests). And, like before, Defendants continue to offer up statistics about OS FOIA processing that do not distinguish between processing for CDC requests (a responsibility OS FOIA took on with Defendants' reorganization) or Secretary staff-division requests (a responsibility for which OS FOIA always has been responsible). For example, Defendants claim that OS FOIA has been working on CDC FOIA requests since May 21 and, between then and the start of September, "has taken the steps necessary to process and fully resolve 196 pre-existing FOIA requests" across its docket. *See* Defs.' Mem. 40; *id.* at 43 (similar regarding productions). But Defendants conspicuously fail to specify how many, if any, of these 196 requests, processed over three or so months, were CDC requests. That figure is not out of step with the monthly number of OS FOIA-specific requests that OS FOIA typically processed before April 1, as CREW has already pointed out. *See* PI Suppl. Reply 4-5 & n.4.[8] And it is far too low to include anything more than a trivial number of the 150-plus FOIA requests CDC typically receives each month. *Id.* at 11 n.10.

Defendants' silence on the subject of CDC-specific processing speaks volumes. It comes in the face of CREW's consistent drumbeat that Defendants noticeably keep dodging opportunities to provide proof. And it comes in the face of mounting evidence over the past six months that OS FOIA is not up to the task of handling CDC work. *See supra* Part I.A. Defendants' explanation for why they have not provided CDC-specific numbers makes no sense. They state that "there

---

[8] The 196 requests, which come out to about 65 requests per month, are roughly in line with the 79-105 requests that OS FOIA processed per month in the three quarters prior to the April 1 reorganization. *See* PI Suppl. Reply 4-5 & n.4. That is especially so when one factors in the resources and time OS FOIA has had to devote to effectuating the April 1 reorganization and the office's loss of staff, which have likely impacted its usual processing.

exists no distinction" between CDC FOIA-request and OS FOIA-request statistics "since requests for CDC records are now part of the OS FOIA portfolio."  Defs.' Counter SOMF ¶ 56; *see also* Defs.' SOMF ¶ 47 (similar for all centralized components).  But there obviously is a distinction, since the requests seek records from different agencies.  And that distinction obviously is salient to this case, which turns on whether Defendants are properly handling requests for CDC records. Defendants plainly have the ability to identify CDC-specific statistics—they have, for example, identified that they have received 212 FOIA requests for CDC records since April 1.  *See* Defs.' Counter SOMF ¶¶ 27, 43.  They just have decided (yet again) to omit any numerical or other proof that these requests or other CDC ones are being properly handled, and to instead rely on their conclusory assurances of compliance.[9]

Defendants' evidentiary failure warrants ruling in CREW's favor.  Courts in this Circuit have rejected similarly unsubstantiated assurances from agencies seeking to defeat policy-or-practice claims.  *See, e.g.*, *Payne*, 837 F.2d at 492; *Mo. Coal.*, 369 F. Supp. 3d at 160-62, 163 n.5 (determining agency had impermissible FOIA policy and rejecting agency's claims to the contrary because declarations offered no examples where agency had abstained from applying policy and nothing supporting assurance that it would not resume); *Muckrock*, 300 F. Supp. 3d at 130, 135-36 (similar); *Colo. Wild Pub. Lands*, 691 F. Supp. 3d at 172-73 (similar).

**c.**     Defendants' attempt to show CDC FOIA compliance through their reading-room uploads also fails.  *See* Defs.' Mem. 40.  In response to CREW's showing that CDC reading-room uploads have ceased, *see* Pl.'s Mem. 25-26, Defendants opt to once again identify statistics that appear not to include CDC records.  Defendants assert that OS FOIA uploaded 70 items to its reading room between April 1 and May 19 and posted an additional 139 items since then.  *See*

---

[9] By claiming that OS FOIA's takeover obviates the need to provide data, Defendants have deployed centralization to obscure what is happening at CDC and impede public accountability.

Defs.' Counter SOMF ¶ 54; Defs.' Mem. 40.  But, as CREW has pointed out, none of these uploads appear to be of CDC records; the CDC reading room itself has not been updated since March, and the HHS reading room does not appear to have new CDC records either.  *See* Pl.'s Mem. 25-26; Suppl. Goldstein MSJ Decl. ¶¶ 20-22 & n.7.  Defendants confirm this conclusion by simply identifying HHS records posted—"HHS FOIA Logs and HHS FOIA Litigation Releases," Defs.' Counter SOMF ¶ 54—and stating with respect to CDC records only that they "*will* be posted" to HHS's website going forward, Fourth Holzerland Decl. ¶ 95 (emphasis added).[10]

    **d.**    Defendants also briefly assert that OS FOIA has the "expertise" to assume the CDC FOIA office's responsibilities, but their arguments on this front each flounder.  Defs.' Mem. 41. Defendants first recycle their failed argument that OS FOIA's experience handling FOIA appeals for CDC gives them the ability to handle CDC FOIA requests in the first instance.  *See id.* Defendants ignore that OS FOIA's appellate review critically depends on the substantial initial legwork of component agencies to process the FOIA requests and their expertise in so doing.  *See* Pl.'s Mem. 31-32 (citing PI Suppl. Reply 12-14 & n.12).[11]  In fact, their own representations prove the point.  *See* Fourth Holzerland Decl. ¶¶ 67-69 (explaining that OS FOIA's work involves review of components' *completed* work to carry out searches, make determinations, and "dispos[e] of . . . cases," based on the "existing record" compiled by components, and explaining that OS FOIA decisions to overturn require "remanding" back to components for them to do "additional work").

---

[10] Defendants' failure to post CDC reading-room records is relevant not just because it illustrates their CDC FOIA shutdown.  It also helps perpetuate the shutdown.  Reading-room records like FOIA logs alert the public to who has pending requests.  Without this information, CREW and others are left in the dark about the full range of requesters affected by the CDC FOIA office closure.  And with HHS throttling the CDC records to be proactively disclosed, the public lacks critical information about CDC policy changes—at a time of significant upheaval at the agency.

[11] This is a broadly applicable principle; courts often recognize that appellate work generally is distinct from, and depends on, the initial adjudicatory analysis on review.  *See, e.g.*, *Brown v. Plata*, 563 U.S. 493, 513 (2011); *United States v. Tilghman*, 134 F.3d 414, 416 (D.C. Cir. 1998).

Nowhere do Defendants explain how OS FOIA is equipped to take on CDC FOIA's legwork in the first instance. Nor could they. OS FOIA already has had to seek automatic extensions for CDC requests because the requests require it to search another "office" and present it with "unusual circumstances." OS FOIA presumably would not need to make this claim if, as it and Defendants now assert, it has intimate knowledge of CDC and other components' structures and programs and considers searches for components' records to be "routine." Defs.' Mem. 41.

Perhaps sensing the weakness of their initial argument, Defendants pivot, in a single sentence, to arguing that a 2024 statistic on OS FOIA's appellate review of CDC FOIA office cases shows that OS FOIA "can handle" the office's work. *Id.* (explaining that OS FOIA affirmed CDC FOIA actions in roughly 12 percent of CDC appeals that OS FOIA handled). It does not. Defendants' argument fails on its own terms—the very data they rely on, together with their own annual FOIA report data, shows that CDC FOIA had a higher affirmance rate and higher affirmance-to-reversal rate than the other components for which OS FOIA handles appeals. *See* Pl.'s Counter-Statement of Disputed Facts ¶¶ 55-56 [hereinafter Pl.'s Counter SOMF]; Suppl. Goldstein MSJ Decl. ¶ 24. Moreover, Defendants' CDC appellate-affirmance statistic is clearly not a legitimate metric. Defendants do not appear to have previously included it (or any other statistics on OS FOIA appeal dispositions by component) among the litany of numerical benchmarks they use in HHS FOIA annual reports. *See* 5 U.S.C. § 552(e) (detailing required benchmarks). (Recall, those benchmarks show that OS FOIA is not up to snuff compared to CDC FOIA. *See supra* 8.) Nor do Defendants appear to have addressed it, or any appellate review issues for CDC, in recent Chief FOIA Officer reports. Finally, the metric says nothing about OS FOIA's ability to take over CDC FOIA work.[12] Instead, it is a newly concocted, cherry-picked,

---

[12] By analogy, a district court judge's rate of reversal by an appellate court says nothing about the latter's ability to take on the former's duties. And, as appellate courts often recognize, their

and bare and unpersuasive figure meant to attack CDC FOIA—to try to make the office look bad and justify its closure post hoc. *See* Fourth Holzerland Decl. ¶ 73 (accusing CDC FOIA of simply trying to clear cases). Defendants' attack misses the mark. It is *OS FOIA's* performance that is at issue in this case, and on that operative question, Defendants fail to carry their burden.

  **e.**  Defendants also point to two new plans they have for their OS FOIA operations, but neither one provides any assurance that their "delinquent" handling of CDC FOIA responsibilities will cease. Defs.' Mem. 42 (quotation marks omitted). Defendants' plan to launch a "pilot program" with "artificial intelligence ('AI') tools to assist" record reviews does nothing to address OS FOIA's pressing workload, staffing, and other issues that render it unable to handle CDC FOIA responsibilities in the short-to-medium term. *Id.* As Defendants themselves explain, the planned AI tool does not aid FOIA searching (which is a processing step that OS FOIA claims presents it with unusual circumstances at CDC); its outputs must be reviewed by "trained FOIA personnel" (which are in scarce supply without the CDC FOIA staff and with OS FOIA's limited staff); and it is simply a test run of a discrete FOIA improvement initiative (which at this point is simply a "goal" that "could" be successful and helpful down the line). *Id.* Defendants' plan to hire "ten employees to support FOIA operations" is likewise a mere band-aid. *Id.* Defendants do nothing to explain how this minimal number is sufficient to take up the workload of the two dozen CDC FOIA employees fired and the employees fired at other HHS components. In fact, the potential new staff likely will not take up this mantle since, according to Defendants, the employees will "carry distinct responsibilities and qualifications." *Id.*

---

reversals of district court judges do not necessarily impugn the judges' abilities or performance, including because these judges do not have the "luxury of 20–20 hindsight" or the sharpened review that occurs on appeal. *Rachel v. Troutt*, 820 F.3d 390, 395 n.6 (10th Cir. 2016); *see also, e.g.*, *Marino v. Drug Enf't Admin.*, 685 F.3d 1076, 1081 n.2 (D.C. Cir. 2012). So too in this context, as Defendants begrudgingly acknowledge. *See* Fourth Holzerland Decl. ¶ 75.

**f.**     Moreover, Defendants fail in their attempt to cast doubt on the Doe declarations that CREW submitted.  As the declarant explained in April, CDC staff who received April 1 RIF notices lost computer access the next day, which is relevant only in that it showed the CDC FOIA office had closed.  *See* Mem. Op. 4 & n.1, ECF No. 29.  The fact that the CDC FOIA office is closed is undisputed, *see* Defs.' SOMF ¶ 6; *infra* 31, so any "systems" access issues later in April and May are immaterial, *see* Defs.' Mem. 43.  Moreover, the Doe declarant did not offer any representations about access during this later period, and CREW is not aware of the access activity Defendants purport to identify and does not have reason to believe from Defendants' representations that the declarant engaged in this activity.  *See* Pl.'s Counter SOMF ¶ 35.  And any disputes on these fronts in no way "call[] into question the rest of the" declarant's statements on other matters, as Defendants claim in cursory fashion.  Defs.' Mem. 43.  They do not explain why any other statements are in doubt.  In fact, Defendants *admit* the declarant's representations in several instances, *see* Defs.' Counter SOMF ¶¶ 3, 5-6, 39, and fail to rebut other ones for the reasons discussed above.  At any rate, the Doe declarations are simply one piece of evidence among a much broader array that CREW has compiled and Defendants fail to rebut.

**g.**     Defendants also fail to support their cursory argument that regulatory violations cannot form the basis of a policy-or-practice claim.  Such violations can support a policy-or-practice claim.  *See* Pl.'s Mem. 21.  *Muttitt v. U.S. Central Command*, 813 F. Supp. 2d 221 (D.D.C. 2011), does not say otherwise.  *Cf.* Defs.' Mem. 23.  FOIA regulations implement FOIA and, as Defendants acknowledge, must be followed.  *Id.* at 25.  In any case, Defendants' regulatory violations, discussed below, are simply the cherry on top of CREW's already-fully-baked policy-or-practice claim.  The claim does not depend on the regulations.  *See* Pl.'s Mem. 32.[13]

---

[13] If regulatory violations cannot support a policy-or-practice claim, that simply bolsters the availability of APA review for Count III.

**h.**      As a last gasp, Defendants offer a strawman; they argue that "the facts of this case [do not] resemble those of any case in which the D.C. Circuit has indicated that a policy-or-practice claim might succeed." Defs.' Mem. 44.  The D.C. Circuit has never imposed a *Bivens*-like test for policy-or-practice violations, whereby claims must match the facts of *Payne*, *Newport*, or *Judicial Watch*.  Nor has it held that the test for a policy-or-practice claim "turn[s]" on whether an agency can establish its "good faith effort and due diligence" in handling certain FOIA requests.  Defs.' Mem. 44 (quotation marks omitted) (discussing belated processing of CREW's five requests). Instead, the Circuit has explained that a policy-or-practice claim lies whenever an agency engages in any conduct—including informal conduct—"that will impair the party's lawful access to information in the future." *Jud. Watch*, 895 F.3d at 777 (quotation marks omitted); *see* Defs.' Mem. 2-3.  Based on that general test, the D.C. Circuit and judges in this District have found viable policy-or-practice claims across fact patterns.  *See* Pl.'s Mem. 20-21.  It is therefore of no moment that the D.C. Circuit has never confronted a circumstance like this one, where an agency had its FOIA office shuttered, its FOIA function destroyed, and its FOIA responsibilities forsaken.

This unique situation is exactly the type that calls for policy-or-practice review and relief. By closing the CDC FOIA office and transferring its responsibilities to an ill-equipped central office, Defendants have designed a FOIA scheme that eliminates any realistic possibility they can timely and properly handle CDC FOIA requests from CREW and others; they have instead opted to generally ignore CDC requests, impose belated and unlawful time extensions to respond to the requests, and wait until litigation to attempt to moot them.  Contrary to Defendants' argument, *see* Defs.' Mem. 44, that is analogous to the impermissible conduct the D.C. Circuit rejected in *Judicial Watch*.  *See* 895 F.3d at 779-81; *see also id.* at 784 (explaining that courts can review whether an "agency has organized its records management systems to enable prompt determinations to

produce records or to invoke an exemption"). And Defendants' argument that processing delays themselves cannot give rise to policy-or-practice claims is refuted by controlling precedent. *Compare* Defs.' Mem. 45, *with* Pl.'s Mem. 37 (citing *Jud. Watch*, 895 F.3d at 779-81, and *CREW*, 415 F. Supp. 3d at 226).

## II.    CREW Has Stated a Viable APA Claim in Count III and Is Entitled to Summary Judgment on that Claim

### A.    CREW Has Standing to Raise Its APA Claim

Defendants mount two halfhearted challenges to CREW's APA standing. Each fails.

First, Defendants briefly argue that CREW lacks standing because it "implicitly" seeks to vindicate "employment-law claims on behalf of [terminated] CDC FOIA employees" and assert those employees' injuries, rather than its own. Defs.' Mem. 2, 9; *see also id.* at 9-10. Not so. CREW easily meets the requirements for asserting standing in its own right.

A plaintiff has standing if it has an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and capable of being "redressed" by the Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). At its core, the standing analysis requires plaintiffs to "answer a basic question—What's it to you?" *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. ----, 145 S. Ct. 2121, 2133 (2025) (quotation marks omitted). Here, the answer is simple—CREW is directly affected by the CDC FOIA office closure as an "organization" that "may submit a FOIA request to [CDC]." 45 C.F.R. § 5.21.

CREW's Amended Complaint and summary-judgment brief make clear that it is seeking to vindicate its *own* claim, and to obtain redress for its *own* injury, as a present and future FOIA requester for CDC records. *See* Am. Compl. ¶¶ 57-58, 61-73, 85-86, 91-93, ECF No. 31 (allegations regarding the improper handling of CREW's present requests and the likelihood that future requests will be improperly handled, and regarding how CREW will be harmed as a FOIA

requester, due to Defendants' unlawful closure of the CDC FOIA office and consolidation of FOIA responsibilities within HHS); Pl.'s Mem. 39, 43 (explaining that CREW's APA claim arises from the shuttering of the CDC FOIA office, rendering the agency's FOIA function nonoperational and directly affecting CREW as a FOIA requester reliant on that function).  CREW frequently uses FOIA requests to CDC and other agencies as a critical tool to "advance its mission" of "disseminat[ing] . . . information about public officials and their actions," particularly government impropriety.  Decl. of Alex M. Goldstein ¶¶ 2-3, ECF No. 13-3; *see also, e.g.*, Suppl. Decl. of Alex M. Goldstein ¶ 23, ECF No. 26-2; Defs.' Counter SOMF ¶ 72.  CDC's closed and inoperative FOIA office—a state of affairs that violates binding regulations—harms that mission by depriving CREW of basic access to agency records.  That concrete injury more than suffices to give CREW a personal stake in this case.  *See, e.g.*, *New York v. Kennedy*, --- F. Supp. 3d ----, No. 25-cv-196, 2025 WL 1803260, at *5-6 (D.R.I. July 1, 2025) (explaining that CDC RIF harms plaintiffs, who rely on impacted services).  It is *CREW's* distinct and particularized impairment, affecting it in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, and doing so separately from the former CDC FOIA officers' employment rights or injuries.

Third-party employee interests have no bearing on this case, despite Defendants' attempt to muddy the waters with them.  CREW does not seek to vindicate the former CDC employees' personnel rights or otherwise allege third-party standing—like the defense-attorney plaintiffs in *Kowalski v. Tesmer* sought to do on behalf of their indigent clients.  *See* 543 U.S. 125, 129 (2004) (cited at Defs.' Mem. 10).  Rather, CREW seeks to vindicate its own right to a functioning and lawfully operating CDC FOIA office.  "Where," as here, "a party champions [its] own rights," courts routinely find standing and reject agencies' invitations to "prudential[ly] limit[]" that standing by bringing third-party considerations into the mix.  *Duke Power Co. v. Carolina Env't*

*Study Grp., Inc.*, 438 U.S. 59, 80 (1978); *see also, e.g.*, *N.Y. Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 552 (D.C. Cir. 2020); *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 498 F. Supp. 2d 150, 158 & 161 n.6 (D.D.C. 2007), *aff'd sub nom.* 545 F.3d 4 (D.C. Cir. 2008); *Mahoney v. U.S. Capitol Police Bd.*, No. 21-cv-2314-JEB, 2024 WL 4235429, at *5 (D.D.C. July 31, 2024). The Court should follow the same course here.

The Court should also reject Defendants' second argument—that CREW lacks standing for its assertions that Defendants "are violating" agency reading-room and research-data regulations. *See* Defs.' Mem. 36-38. Defendants misapprehend CREW's claim. CREW is not arguing that these particular regulatory violations are freestanding ones that injure it and entitle it to relief in the form of reading-room and research records. Rather, CREW relies on the reading-room and research-data provisions to support its claim that the HHS FOIA regulations in various ways require Defendants to maintain a functional CDC FOIA office—*e.g.*, by requiring HHS components to operate and maintain their own reading-room websites and process requests for their own research data—and that Defendants have violated this requirement by shuttering the office. It is *this* violation that forms the basis of CREW's APA claim. *See* Pl.'s Mem. 40-42.

For this reason, *CREW v. United States Department of Justice*, 846 F.3d 1235, 1243 (D.C. Cir. 2017) (discussed at Defs.' Mem. 37-38), has no bearing on CREW's APA claim. There, the D.C. Circuit considered a court's remedial power to order posting of reading-room records where CREW pleaded a claim for such relief invoking 5 U.S.C. § 552(a)(2). It did not consider what is at issue here: the elimination of an agency FOIA office and, thus, of the agency's ability to operate its own independent FOIA reading room and make its own, agency-specific identifications and determinations of what records "must be made publicly available." 45 C.F.R. § 5.2(b); *see also 2025 Chief FOIA Officer Report*, *supra*, at Section III (detailing how agencies work with their own

"program offices" to identify covered records, how they work with their own "IT staff" and "communications offices" to identify covered records, and how they post distinct records).[14]

### B.    FOIA Does Not Preclude CREW's APA Claim

Defendants contend that CREW's APA claim is precluded because FOIA provides it with an adequate remedy, but their argument rests on distinguishable case law: cases holding that APA review is not available, and ordinary FOIA review suffices, "when litigants seek to gain improperly withheld agency records."  Defs.' Mem. 13 (quotation marks and citation omitted); *see id.* at 12-16.  That case law is inapplicable to CREW's APA claim.  As Defendants acknowledge, the claim does not concern a particular records dispute—to which the review procedure Congress created in FOIA would apply—but instead concerns their violation of binding agency "regulations" when they closed the CDC FOIA office and the need to "set aside" that closure.  *Id.* at 11.

A close examination of the cases Defendants marshal reinforces their inapplicability. Consider *CREW*, 846 F.3d 1235, the main case on which Defendants rely.  *See id.* at 11-15.  There, CREW sought to obtain certain agency records—final opinions and policy statements from the Department of Justice's Office of Legal Counsel ("OLC")—that it asserted had to be disclosed under FOIA's reading-room provision, 5 U.S.C. § 552(a)(2).  *See CREW*, 846 F.3d at 1238-39. The agency disagreed, contending that the OLC opinions and policy statements were privileged and did not constitute binding law, and thus were exempt from FOIA and could be withheld.  *Id.* at 1239.  In adjudicating this records dispute, the D.C. Circuit held that FOIA provides an adequate remedy because the statute's reading-room provision itself affords an enforceable claim.  *Id.* at

---

[14] In any event, CREW has already submitted a request for reading-room records.  *See* Goldstein MSJ Decl. ¶ 10.  Defendants have applied the exact same policy or practice to this request that they have applied to CREW's other requests, including by claiming that "unusual circumstances" apply.  *See id.*; Suppl. Goldstein MSJ Decl. ¶¶ 13-16.  That "unusual circumstance" would not exist if CDC could maintain its own reading room, as HHS regulations require.

1245. But here, CREW and Defendants are not disputing whether particular records can be withheld. Nor is there some clearly established and explicit provision under FOIA for litigants to press claims related to regulatory violations—violations unrelated to withholdings of reading-room records under § 552(a)(2) or other records under § 552(a)(3), and instead concerning the wholesale elimination of an agency's FOIA function. For these reasons, *CREW* is inapposite. Nothing in its analysis supports Defendants' argument that FOIA, rather than the APA, is the exclusive mechanism for parties to litigate disputes related to regulatory violations and agency office closures, and for courts to "set aside" those actions. Those are classic APA issues.

The remaining FOIA cases on which Defendants rely are equally distinguishable. Each involved instances where litigants sought to press grievances over the withholding of requested records under the APA, even though § 552(a)(2) afforded them a right of judicial review for such claims. *EPIC v. Internal Revenue Service*, 261 F. Supp. 3d 1, 12 (D.D.C. 2017) (cited at Defs.' Mem. 13), is an illustrative example. There, the court rejected an APA claim challenging an agency's decision not to process a FOIA request and seeking processing of the request because (a) FOIA provides an adequate remedy "when litigants seek[]" such processing, and (b) litigants "cannot bring APA claims that seek remedies available under FOIA," *i.e.*, processing of their requests and release of nonexempt responsive records. *EPIC*, 261 F. Supp. 3d at 12 (cleaned up). As discussed, these factors are not present here. CREW's APA claim attacks the legality of the wholesale closure of the CDC FOIA office (not the processing of its five April 1 FOIA requests), and it seeks the set aside of Defendants' decision (not the release of records after full processing).[15]

---

[15] Comparing to *Greenpeace, Inc. v. Department of Homeland Security*, 311 F. Supp. 3d 110 (D.D.C. 2018) (cited at Defs.' Mem. 13), is similarly illustrative. There, this Court rejected a plaintiff's effort to obtain APA review in a "run-of-the-mill FOIA case involving a request that [an agency] turn over specific information it has withheld," and to obtain the "exact relief" that FOIA provides, *i.e.*, "an order to turn over the requested information." *Greenpeace*, 311 F. Supp. 3d at 126. Again, these considerations are not present here. An agency's shuttering of its entire

Defendants also fail to distinguish cases on which CREW relies.  *See* Defs.' Mem. 14-15.
As CREW has explained, cases like *Muttitt*, *Public Citizen*, and *National Security Counselors*
show how courts can properly consider APA claims like CREW's claim—those raising regulatory
and other legal violations that are FOIA-related but not connected to the processing of any
particular FOIA requests.  *See* Pl.'s Mem. 40; *see also, e.g.*, *Nat'l Ass'n of Waterfront Emps. v.
Chao*, 587 F. Supp. 2d 90, 98 (D.D.C. 2008) (explaining that APA review is available for
rulemaking issue, apart from FOIA processing); *S. Env't L. Ctr. v. Council on Env't Quality*, 446
F. Supp. 3d 107, 115-18 (W.D. Va. 2020) (similar); *Roberts v. Internal Revenue Serv.*, No. 8:13-
cv-1731-T-33TBM, 2014 WL 1724383, at *3-4 (M.D. Fla. Mar. 17, 2014) (explaining plaintiffs
can maintain APA and FOIA claims where the former is non-duplicative and seeks distinct relief);
*cf. Radack v. U.S. Dep't of Just.*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005) (similar for APA and
Privacy Act claims).  Rather than engage with this basic principle, Defendants contend in cursory
fashion that *CREW* "abrogates" it.  Defs.' Mem. 15.  It does not.  *CREW* did not consider a
regulatory violation unconnected to particular requests, so it had no occasion to foreclose the
availability of APA review for such a violation.  It simply held that litigants seeking to enforce
FOIA's reading-room provision to obtain covered records could rely on that provision itself.  And
contrary to Defendants' assertion, *Muttitt* does not undermine CREW's APA claim either.  The
decision explains that procedural violations unconnected to the processing of any particular request
are fair game for APA review, and it declined to apply this straightforward principle only because,

---

FOIA office is not a routine FOIA matter; and setting aside that action is relief that is worlds apart
from ordering the disclosure of withheld records.  The same holds true for all the other FOIA cases
that Defendants cite—even the few they claim are comparable because they involved an alleged
regulatory violation or FOIA policy.  *See* Defs.' Mem. 15.  Across *all* the cases cited by
Defendants, the plaintiffs' APA claims sought to litigate withholding disputes and processing
issues, and to obtain identical FOIA and APA relief with respect to those issues—unlike here.

unlike CREW, the plaintiff did not allege such a violation.  *See Muttitt*, 813 F. Supp. 2d at 228-29.

Nor does CREW's FOIA policy-or-practice claim foreclose its APA claim, as Defendants argue.  *See* Defs.' Mem. 14-15.  CREW's APA claim targets Defendants' unlawful implementation of the DOGE RIF Order against the entire CDC FOIA office, whereas its policy-or-practice claim targets the downstream impact of that APA violation on the processing of CREW FOIA requests.  *See* Pl.'s Mem. 40.  In that sense, the claims reinforce each other, as CREW has acknowledged, *see* Defs.' Mem. 14, but they plainly center on different violations.[16]  And they seek different remedies.  CREW's APA claim seeks a set aside of the CDC FOIA office closure, whereas its policy-or-practice claim seeks an order requiring Defendants to augment FOIA review resources for CDC FOIA requests.  *See* Pl.'s Mem. 36, 40.  Those are not merely "mismatch[ed]" forms of relief, Defs.' Mem. 13, 16 (quoting *CREW*, 846 F.3d at 1246); they are fundamentally distinct.  The latter would permit Defendants to continue relying on ill-equipped central FOIA staff, and it would not require Defendants to reopen the CDC FOIA office or use CDC FOIA personnel and infrastructure to handle CDC FOIA requests and other FOIA responsibilities—as binding regulations mandate.  Because that is the only way to afford CREW proper relief for its APA claim resting on those regulations, its APA claim should be allowed to proceed.

Taking a step back and considering the practical realities reinforces this conclusion.  If Defendants' view prevails, an agency could eliminate its FOIA office and force requesters to play whack-a-mole via individual FOIA suits for particular requests or to litigate protracted policy-or-practice claims offering incomplete relief—all while the agency deploys a delay strategy to mask the consequences of its destructive actions and does nothing to address any root-cause regulatory

---

[16] Defendants also fail to recognize the context in which CREW stated that the claims are "linked." Defs.' Mem. 14 (quoting Stay Opp. 18 n.8).  CREW was simply rebutting Defendants' suggestion that the Court should stay ongoing dispositive briefing except as to the APA claim.

violations.  Defendants do not explain why FOIA would compel this result.  "The Supreme Court has long instructed that the generous review provisions of the APA must be given a hospitable interpretation such that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review."  *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quotation marks omitted).  No such clear-and-convincing evidence is available where, as here, CREW's APA claim seeks to litigate a classic APA contrary-to-law question.

Accordingly, the Court can easily "thread" the proverbial "needle" and apply targeted APA review here.  Defs.' Mem. 14.  Doing so would not be a monumental change in "uniform[]" practice, *id.* (citation omitted), since it would be consistent with the case law and principles discussed above and confined to, and justified by, the unique facts presented here.

### C.    CREW's APA Claim Challenges Final Agency Action

Defendants assert that CREW's APA claim does not challenge either "agency action" or agency action that is "final."  Defs.' Mem. 16-19.  Neither assertion withstands scrutiny.  CREW's APA claim challenges the closure of the CDC FOIA office when, on April 1, Defendants applied the DOGE RIF Order to terminate all the office's employees and then transferred its responsibilities to OS FOIA.  *See* Am. Compl. ¶¶ 61-62, 64, 92; Pl.'s Mem. 39-41; Decl. of William H. Holzerland ¶¶ 17-18, ECF No. 18-1 (cited in Am. Compl. ¶ 64 n.39, discussing April 1 centralization of CDC FOIA responsibilities) [hereinafter Holzerland Decl.]; Suppl. Decl. of William H. Holzerland ¶¶ 6-7, ECF No. 25-1 (cited in Am. Compl. ¶ 64 n.39, discussing April 1 "FOIA reorganization") [hereinafter Suppl. Holzerland Decl.]; *see also, e.g.*, Third Holzerland Decl. ¶ 8 (similar).  This is discrete, consummated, and legally consequential decision-making— exactly the stuff of "agency action," and agency action that is "final," under the APA.

The APA defines "agency action" broadly to include "the whole or a part of an agency

rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C.

§ 551(13). This definition is "meant to cover comprehensively every manner in which an agency

may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Defendants'

April 1 decision to terminate all CDC FOIA office employees, close the office, and transfer its

responsibilities to OS FOIA plainly falls within this definition, for it is a "specific" and delineated

exercise of agency power. *Biden v. Texas*, 597 U.S. 785, 809 (2022); *see also, e.g.*, *Drs. for Am.

v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39, 50 (D.D.C. 2025). "The government [cannot] seriously

challenge" this straightforward conclusion, *Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219

F. Supp. 2d 20, 38 (D.D.C. 2002), nor does it. Defendants themselves consistently describe their

conduct as the specific and discrete exercise of agency power. *See* Defs.' Mem. 30; *see also, e.g.*,

Holzerland Decl. ¶ 18; Third Holzerland Decl. ¶ 8. They fail to acknowledge their own framing

or explain why, contrary to it, they have not carried out "agency action."

Although Defendants briefly suggest that their April 1 decision is "among the wide variety

of activities that comprise the common business of managing government programs," and

therefore is a broad programmatic issue not reviewable as "agency action," they do not actually

deliver on this claim. Defs.' Mem. 17 (quotation marks omitted). They offer zero explanation for

it. The lone authority they quote, *Fund for Animals, Inc. v. U.S. Bureau of Land Management*,

460 F.3d 13, 20 (D.C. Cir. 2006), is nothing like this case. There, what was at issue was an

agency's budget request to Congress—its "broad programmatic statement" laying out its proposal

for funds and "planning" and "goals" for its animal restoration strategy. *Fund for Animals*, 460

F.3d at 20-21 (quotation marks omitted). Here, CREW challenges specific conduct already carried

out—Defendants' decision to close the CDC FOIA office and centralize its duties.[17]

---

[17] This distinction also demonstrates why other cases Defendants cite in passing are inapplicable.
*See* Defs.' Mem. 17 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004), and *Lujan*

This decision is also "final" under the APA because it satisfies the two-pronged test for finality. It (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted).

Under the first prong, Defendants' decision to close the CDC FOIA office and transfer its responsibilities is plainly consummated decision-making because it is "definitive." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). There is nothing informal, "tentative[,] or interlocutory" about it. *Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). Defendants themselves emphasize and admit—across filings—the conclusive nature of the CDC FOIA office's closure, and of OS FOIA's assumption of its work. *See* Defs.' Mem. 6, 30 (describing operation and responsibilities of "former" CDC FOIA office as folded into OS FOIA as of April 1); Defs.' Counter SOMF ¶¶ 6, 20 (admitting that CDC FOIA staff were placed on administrative leave, CDC FOIA office no longer exists, and CDC FOIA webpage directs requesters to OS FOIA); Suppl. Holzerland Decl. ¶¶ 7, 17-18 (similar); *see also* Mem. Op. 6 & 4 n.1. And they provide "no indication" they will "reconsider" things. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 823 F.2d 608, 615 (D.C. Cir. 1987). Far from it—they double down, *see* Defs.' Mem. 5-6, 39-40, just as they have done before, *see, e.g.*, Stay Opp. 16. In fact, they have memorialized things in a post-hoc memorandum, further confirming their decision-making process has run its course. *See* Fourth Holzerland Decl. ¶ 86.

---

*v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)). Unlike the plaintiffs in *Norton* and *Lujan*, CREW is not mounting a sweeping "programmatic" attack without some "identifiable action or event" in dispute. *Lujan*, 497 U.S. at 891, 899 (quotation marks omitted); *see Norton*, 542 U.S. at 65-67 (similar). It is challenging Defendants' discrete April 1 decision-making. The fact that this decision-making involved individual firings is of no moment. Defendants' decision to fire all CDC FOIA employees "across the board" and thus close the FOIA office "of course" represents the type of discrete "agency action" subject to APA review. *Lujan*, 497 U.S. at 890 n.2.

It is equally clear that, under the second finality prong, Defendants' definitive actions had "direct and appreciable legal consequences." *Hawkes*, 578 U.S. at 598. CREW and others could no longer access records under FOIA from CDC and instead had to rely on OS FOIA, a backlogged and ill-equipped office that by law cannot handle all CDC FOIA responsibilities, for CDC records. *See* Am. Compl. ¶¶ 51, 53-54, 58, 64-73, 91-93; Pl.'s Mem. 39; Defs.' Counter SOMF ¶¶ 21-25, 36 (admitted facts). OS FOIA fully stepped into CDC FOIA's shoes—assuming all of the now-defunct office's relationships and duties—which had both the legal effect of forcing CREW and others to vindicate their statutory and regulatory FOIA rights to CDC records through OS FOIA and OS FOIA alone, and the practical effect of impairing their access to these records. Under the "pragmatic approach [that courts] have long taken to finality," this impact clearly gives rise to final agency action. *Hawkes*, 578 U.S. at 599; *see also, e.g.*, *Drs. for Am.*, 766 F. Supp. 3d at 51 (holding that removal of webpages that plaintiffs had a right to access determined "rights and obligations" and was thus final); *Wiley v. Kennedy*, --- F. Supp. 3d ----, No. 25-cv-00227, 2025 WL 1384768, at *9-10 (S.D.W. Va. May 13, 2025) (similar regarding HHS's decision-making firing employees for its Coal Workers' Health Surveillance Program, which affected plaintiff and other miners); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 91-94 (D. Md. 2025) (similar).

Tellingly, Defendants do not actually contend that their challenged conduct is either unconsummated or legally inconsequential. Defendants simply quibble about the recent cases CREW cited, claiming they are distinguishable because they involve "alleged wholesale closures of agencies" rather than, as here, the closure of an agency "component." Defs.' Mem. 18. Yet that distinction only strengthens CREW's APA challenge. On Defendants' logic, CREW's APA claim centers on more delineated and targeted agency decision-making than the broader, less discrete actions at issue in the recent litigation involving, *inter alia*, the Department of Education

or the CFPB.[18]  That some of these recent cases have been stayed also does not affect their relevance, since a stay pending appeal "does not make or signal any change" in the "law." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring); *cf. Trump v. Boyle*, 606 U.S. ----, 145 S. Ct. 2653, 2654 (2025) (explaining that interim orders are not conclusive as to merits).

In any event, CREW cited the ongoing cases only to provide recent examples applying the general principle—which is settled law—that definitive agency conduct that terminates programs or functions or otherwise impairs them, and that in turn directly affects interested parties, is final agency action. *See, e.g.*, *Texas*, 597 U.S. at 808; *Ciba-Geigy Corp. v. U.S. Env't Prot. Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986).  CREW's APA claim rests on this general principle, and it therefore does not rise or fall depending on the fate of certain recent cases.

### D.    Defendants' Closure of the CDC FOIA Office Violates Their Binding Agency Regulations and Is Thus Contrary to Law Under the APA

The parties agree that Defendants must comply with HHS FOIA regulations.  *See* Pl.'s Mem. 40; Defs.' Mem. 25.  The parties also agree that courts "must start with the plain meaning of the [regulatory] text, looking to the language itself, the specific context in which that language is used, and the broader context" of the regulatory and statutory scheme.  *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 65 (D.D.C. 2019) (citation omitted); *see* Defs.' Mem. 25, 32.

---

[18] The D.C. Circuit's opinion in the CFPB litigation also is distinguishable on Defendants' logic. *See Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025) (cited in passing at Defs.' Mem. 18).  The court's reasoning further demonstrates why the case has no bearing here. As the court explained, the alleged CFPB shutdown was (a) "abstract" because plaintiffs had not identified any agency statement prescribing or implementing it; (b) "not final" because it was not a "definitive" decision to stop agency work; and (c) "insufficiently discrete" because it did not derive from any authoritative source.  *Id.* at 783-85 (cleaned up).  All three considerations cut in the exact opposite direction here.  Defendants have (a) explained that they shut down the CDC FOIA office through a concrete reorganization effectuated April 1 and memorialized August 1, (b) stood by their decision and continued to build on it, and (c) identified 45 C.F.R. § 5.3, their August 1 memorandum, and Executive Order 14,210 as their legal bases.

Where the parties diverge is their fidelity to these principles.  CREW has hewed closely to them.
*See* Pl.'s Mem. 40-42.  Defendants respond with an atextual and novel regulatory interpretation—
one that turns on a tortured reading of a single regulatory provision.

      **1.**      **The Plain Text of the HHS FOIA Regulations Does Not Authorize the
CDC FOIA Office Closure**

Defendants claim that the "discretion" 45 C.F.R. § 5.3 gives OS FOIA to handle FOIA
requests involving other HHS Operating Divisions "[i]n *certain* circumstances" actually gives the
office that authority to handle "*all* FOIA requests."  Defs.' Mem. 27 (emphases added).  That claim
is wrong.  It rests on the false premise that OS FOIA's discretion is "unqualified" both as a general
legal matter, *see id.* (urging that "discretion" allows wielder to exercise power according to his
"own understanding and conscience" (quotation marks omitted)), and as a textual one, *see id.* at
27, 31, 33 (arguing that § 5.3 does not "limit[]" OS FOIA's authority to handling "some" requests).

The mere use of the word "discretion" in statutory or regulatory text is not a talisman that
authorizes any agency exercise of authority, based on its own unchecked views and irrespective of
textual limitations. "It is well settled that an agency, even one that enjoys broad discretion, must
adhere to voluntarily adopted, binding policies that limit its discretion." *Seeger v. U.S. Dep't of
Def.*, 306 F. Supp. 3d 265, 283 (D.D.C. 2018) (brackets and quotation marks omitted) (quoting
*Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)); *cf. Window Covering Mfrs. Ass'n v.
Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1290 (D.C. Cir. 2023) (explaining that agencies
have unchecked discretion only when "courts have . . . no concrete limitations to impose on the
agency's exercise of discretion" (quotation marks omitted)).  Here, the plain text of § 5.3 restricts
OS FOIA's discretion; it permits the office to handle FOIA requests "involving" other divisions,
like CDC, only in "*certain* circumstances." 45 C.F.R. § 5.3 (emphasis added).  The word "certain"
"limits" OS FOIA's power to handling "some" requests of another division, Defs.' Mem. 27,

because "certain" does mean "some."  *See Certain*, Collins Dictionary, https://www.collins dictionary.com/dictionary/english/certain (defining certain as, *inter alia*, "some, but not very much; appreciable").[19]  It therefore does not mean "all."

In arguing to the contrary, Defendants ignore ordinary English.  They also flout basic interpretive rules.  Namely, Defendants render superfluous the "certain circumstances" limitation in § 5.3, and render obsolete the separate division FOIA "officials," "operations," "programs," "offices," and "process[ing]" that the regulations carefully delineate as part of the "decentralized" HHS FOIA system they set out.  Pl.'s Mem. 41.  Defendants read the "exception" to this decentralization—OS FOIA's discrete power to occasionally go beyond its purview of processing requests for Secretary staff-division records—so broadly that it "swallow[s] the rule."  *Pac. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 113 F.4th 943, 949 (D.C. Cir. 2024) (quotation marks omitted).  Defendants offer nothing to justify these cardinal construction errors.

The broader context in which § 5.3's limited conferral of discretion sits confirms its limited scope and incompatibility with Defendants' assertion of broad OS FOIA processing power.  For one, § 5.3 itself explains that OS FOIA's discretion to process requests beyond Secretary division records is in play only when the requests "involve[] other [divisions]."  45 C.F.R. § 5.3.  The logical implication is that OS FOIA's discretion applies only when another division's request implicates overlapping jurisdictions—involving records not just from that division but also from OS FOIA or another division—and thus overlapping work.  Defendants' own declarant supports this view.  As he has explained, OS FOIA historically has been involved in another FOIA office's processing of a request when that request also implicates it or another office, *see* Suppl. Holzerland

---

[19] *See also, e.g.*, *Certain*, Oxford English Dictionary, https://www.oed.com/dictionary/certain_ adj?tab=factsheet#9732757 (defining "certain" as, *inter alia*, "[o]f positive yet restricted . . . quantity, amount, or degree" and "a restricted or limited number of"); *Certain*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/certain (similar).

Decl. ¶ 32 (explaining that "while a requester may submit a FOIA request to a particular HHS FOIA Office like the former CDC-FOIA office, it often happens that the fulfillment of the request will involve other FOIA offices within the Department (often OS-FOIA), either to search for or review records"); otherwise, HHS FOIA administration has traditionally been "decentralized" with "independently run FOIA offices," Holzerland Decl. ¶ 6.   Neither he nor Defendants identify a circumstance where OS FOIA previously has taken its limited power to handle overlapping requests and used it to subsume a division's FOIA workload, as they now claim OS FOIA can do.

Defendants' reading is unprecedented.   For years, Defendants have, in their annual FOIA reports, emphasized and celebrated the decentralized nature of the HHS FOIA system and the authority and autonomy of division FOIA offices.   *See* Pl.'s Mem. 42;  *U.S. Department of Health and Human Services (HHS) Chief Freedom of Information Act (FOIA) Officer Report*, at 14, HHS (Mar.  15,  2010),  http://web.archive.org/web/20130607023958/http://www.hhs.gov/foia/final_ chief_foia_officer_rpt.pdf ("The Department has an established legacy of a decentralized FOIA program structure for responding to FOIA requests."); *Chief Freedom of Information Act (FOIA) Officer Reports (2011)*, at Section II, HHS, http://web.archive.org/web/20130614133005/ http://www.hhs.gov/foia/reference/step2.html (explaining that "[e]ach [HHS] office has a unique situation in terms of the records it handles and the nature of the programs with which it deals," and that, in the "decentralized" system, offices can address their own workload, staffing, and technology needs); *HHS Fiscal Year 1998 Freedom of Information Annual Report*, HHS, http:// web.archive.org/web/20130607023955/http://www.hhs.gov/foia/98anlrpt.html  (explaining  that HHS operating divisions have the authority to release or deny their own records); *see also* Holzerland Decl. ¶ 6.  Although the reports do not have "the force of law," Defs.' Mem. 32, they are relevant because they reflect Defendants' official views on FOIA administration, *see id.*; *2025*

*Chief FOIA Officer Report*, *supra*, at Introduction, and show that, in shuttering the CDC FOIA office, Defendants have abruptly departed from their long-standing and consistent position that their FOIA regulations create an intentionally diffuse organizational design.

The regulations have maintained this decentralized design for decades, with a clear through-line to present day.  Since the 1980s, the regulations have made clear that component FOIA officials exist and operate independently from OS FOIA.  *See* 52 Fed. Reg. 43,575, 43,581-82 (Nov. 13, 1987).  The current iteration of the regulations, promulgated in 2016 through notice-and-comment rulemaking, worked no change to this system.  As HHS explained in the 2016 proposed rule, it was updating the regulatory discussion of "organizational structure" simply to reflect that additional divisions had been "created," and "to specify that each HHS Freedom of Information Officer" for the divisions "has the authority to task agency organizational components to search for records in response to a FOIA request and provide records located to the cognizant FOIA office."  81 Fed. Reg. 39,003, 39,004 (June 15, 2016).  The finalized regulations, which are operative today, fully align with this description.  They state that (1) the FOIA officials of CDC and other divisions are "the officials who are responsible for overseeing the daily operations of their FOIA programs in their respective Operating Divisions or Staff Divisions, with the full authority as described in the definition of *Freedom of Information Act (FOIA) Officer*"—*i.e.*, the authority to search for records, provide records, and carry out other processing responsibilities, and (2) "[t]hese individuals serve as the principal resource and authority for FOIA operations and implementation within their respective Operating Divisions or Staff Divisions."  45 C.F.R. § 5.3.

This regulatory language is crystal clear: division FOIA officials, and by extension the divisions to which they belong, have their own FOIA operations, programs, authority, and responsibilities, independent of HHS.  The other regulatory provisions are fully consistent with

this decentralized system. *See* Pl.'s Mem. 40-42. And the benefits of this design are straightforward: divisions like CDC can address their own unique FOIA needs, and they can rely on their own FOIA staffs, which have the requisite expertise on their own distinct records systems, structures, and scientific and technical work, to efficiently "task agency organizational components to search for records in response to a FOIA request" and provide responsive and non-exempt ones to requesters. 45 C.F.R. § 5.3; *see* Defs.' Mem. 31; PI Reply 15 n.6; PI Suppl. Reply 13.

### 2. Defendants' Efforts to Circumvent the Plain Text Fail

Defendants mount various efforts to get around the plain regulatory text, but each fails. They first offer up a strawman, arguing that CREW's claim fails because, contrary to the claim, the regulations nowhere use "mandatory terms" like "mandate" or "require" to describe the existence of the CDC FOIA office, other division FOIA offices, or their officers. Defs.' Mem. 31; *see id.* at 32-33. CREW has not "stake[d]" its claim on such terms. *Id.* at 31. Rather, its claim follows logically from the regulatory language expressly contemplating that separate division FOIA officials, offices, operations, programs, authority, and responsibilities *do* already exist and will continue to exist as part of the decentralized HHS FOIA system the regulations lay out. *See supra* Part II.D.1; Pl.'s Mem. 41. Defendants do not meaningfully grapple with this common-sense conclusion. They do not explain why the regulations would describe divisions' separate and autonomous FOIA spheres but also contemplate that they need not exist and can be collapsed.

Next, Defendants attempt to write off the regulatory provision expressly characterizing the HHS FOIA design as "decentralized" and comprised of FOIA offices with their own officials; they claim the provision is an "isolate[ed]" one that cannot, in "context," support a reading of the regulations that requires a separate CDC FOIA office. Defs.' Mem. 32. But read in the context of the various provisions contemplating separate divisional FOIA work and apparatuses, that is exactly what the provision does. Again, it makes no sense for the regulations to explicitly

38

characterize the HHS FOIA design as decentralized but nonetheless contemplate that separate division FOIA offices need not exist and OS FOIA—which may handle other divisions' requests only in "certain circumstances"—has unbounded authority to centralize operations.

Finally, Defendants try to sidestep the plain language describing division FOIA officials' power over daily FOIA operations and programs. *See* Defs.' Mem. 32-33. Defendants claim this power is not an independent one—that is, one that operates separately and thus demonstrates the need for a distinct CDC FOIA office, with all its accoutrements—but instead is one entirely derived from HHS "delegated authority." *Id.* Yet that is not what the plain language of § 5.3 says. The provision states that HHS has various operating divisions, including CDC, and these divisions' FOIA officers have the "*full authority* as described in the definition of *Freedom of Information Act (FOIA) Officer*"—*i.e.*, "the authority" that "an HHS official" also has "to release or withhold records" or carry out other processing work—for "their [own] respective . . . [divisions]." 45 C.F.R. § 5.3 (first emphasis added). It also states that division officers are the "principal resource and authority for FOIA operations and implementation within their respective [divisions]." *Id.* In other words, the provision gives CDC and other division FOIA officials free rein over their separate FOIA domains and places them on equal footing with their FOIA counterparts at HHS— like the "*HHS Freedom of Information Act (FOIA) Officer*" in OS, who likewise has the power to "oversee[] the daily operations" within his or her own domain. *Id.* This language providing for distributed and separate authority makes good sense. It helps give effect to the decentralized FOIA system the regulations set out, and it facilitates the key benefit of this decentralization: division FOIA officials can apply their division-specific expertise to handle requests for division records.

The regulatory language in no way pegs divisions' independent FOIA authority to any delegation from HHS. The plain text does not require this outcome. It specifically demarcates

division officials' separate existence and authority over divisional FOIA operations and implementation, with zero mention about how they operate pursuant to an HHS official's delegation and in HHS's "stead." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1271 n.3 (D.C. Cir. 2018) (quoted at Defs.' Mem. 28) (similar).[20] All it states with respect to HHS is that division officials have the full processing authority that an HHS official does, regardless of whether the latter operates with "delegated" authority. Going beyond this logical reading, to condition divisional FOIA authority and in turn the very existence of a division's FOIA apparatus, on any sort of separate HHS pass-down, makes no sense. It not only contravenes the actual language describing divisions' independent FOIA authority, but also flies in the face of, and renders superfluous, the HHS FOIA regulatory scheme itself. Under Defendants' reading, the scheme's careful delineation of a "decentralized" HHS FOIA structure—with separate and independent divisional FOIA officials, operations, offices, programs, responsibilities, and authority—is all for naught, able to be done away with by a single HHS bureaucrat exercising amorphous and delegated "discretion." That cannot be.

In any event, Defendants do not identify any regulatory basis for their extravagant assertion of power. They do not point to anything in 45 C.F.R. Part 5 enabling them to delete from existence an established division FOIA office with its own delineated workforce, duties, and powers. The regulations do not give anyone this authority, allow it to be delegated, or describe a delegation

---

[20] This circumstance stands in stark contrast to *United States v. Libby*, 429 F. Supp. 2d 27, 44 (D.D.C. 2006) (cited at Defs.' Mem. 28-29). There, in the context of rejecting an Appointments Clause challenge, the court explained that the special counsel was removable at will by the Deputy Attorney General (and thus an inferior officer) because the counsel was operating based only on limited and temporary authority delegated in memoranda, absent governing regulations. *See id.* at 38-44. Here, Defendants do not identify any comparable delegation. Likewise, they do not identify any regulatory language indicating that HHS "may delegate" to the division offices but need not do so. Defs.' Mem. 29 (quoting *Thunder v. U.S. Parole Comm'n*, 133 F. Supp. 3d 5, 9 (D.D.C. 2015)).

chain for it—let alone one in which an unspecified HHS official can shutter a division office and transfer its functions.  If Defendants wanted to restructure their FOIA operations, they should have amended their regulations in the proper course before doing so.  But they did not, so they remain bound by the regulatory language on the books.  *See Nat'l Env't Dev. Ass'n's Clean Air Project v. Env't Prot. Agency*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("Although it is within the power of an agency to amend or repeal its own regulations, an agency is not free to ignore or violate its regulations while they remain in effect" or "to play fast and loose with" them (cleaned up)).[21]

### 3.    Defendants' Revocation of Delegated Authority Is Immaterial

Against this regulatory backdrop, the August 1, 2025 Holzerland memorandum, purporting to revoke and reassign all the CDC FOIA office's "delegated" authorities after the fact, is a smokescreen.  Defs.' Mem. 30.  It is immaterial because the regulations do not provide Holzerland (or anyone else) with this power.  The regulations separately provide for the CDC FOIA office's authority and existence; these are not matters of delegation.  Thus, Holzerland cannot unilaterally revoke the office's independent FOIA processing authority (which was never his to confer or take back), and he likewise cannot exercise any delegated discretion to close the office (which never existed simply by virtue of his will).  Because Holzerland lacks the office-closure power he claims, Defendants' delegation argument falls apart from the get-go.  Defendants cannot "effectively

---

[21] The Court can reject Defendants' delegated-authority argument simply based on plain regulatory language, without needing to resort to any specific canons of construction.  Two canons do offer additional reason to reject Defendants' argument, however.  First, it "hide[s] [an] elephant" (the power to eliminate a division's separately described FOIA authority and apparatus) "in [a] mousehole[]" (a stray reference to a delegation solely within HHS, to an HHS official, that the regulation presumes already "has been" carried out).  *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 746 (2022) (Gorsuch, J., concurring) (quoting *Whitman*, 531 U.S. at 468).  Second, it overrides the "specific" definition of division FOIA officers as operating with their own authority with the more "general" definition of a FOIA officer as operating with delegated HHS authority.  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

amend the Code of Federal Regulations by issuing a memorandum with contradictory guidance." *Scott & White Health Plan v. Becerra*, 693 F. Supp. 3d 1, 17 (D.D.C. 2023).

Defendants' argument also fails on its own terms. Defendants fail to identify regulatory text to support their claim that they have the power to close the CDC FOIA office by "exercis[ing] their discretion to end CDC's delegated authority." Defs.' Mem. 30. Because they cannot do so, they instead attempt to place their August 1 memorandum at the end of a "series" of past memoranda delegating "authority over FOIA operations." *Id.* at 29. But these past memoranda relate to, and effectuate delegations of, the Chief FOIA Officer's authority. Under the regulations, the Chief FOIA Officer's authority is distinct from ordinary FOIA officials' authority to process requests and run individual division FOIA programs—it instead concerns general oversight of FOIA "compliance" department-wide by a "senior [HHS] official." 45 C.F.R. § 5.3.[22] And unlike for division FOIA officials, the regulations expressly contemplate for the Chief FOIA Officer that the official's oversight responsibilities are delegated. *See id.* In other words, Defendants' delegation-memoranda foray is a sideshow with no bearing on the CDC FOIA office's existence.

Defendants tacitly admit as much in their argument. As they explain, the regulations specify that the Chief FOIA Officer is an HHS official with department-wide "responsibility for ensuring efficient and appropriate" FOIA compliance, monitoring FOIA implementation, and making recommendations on FOIA implementation. Defs.' Mem. 26-27 (quoting 45 C.F.R. § 5.3). And, as Defendants further explain, the regulations specify that the HHS Secretary "has designated" the "Assistant Secretary for Public Affairs (ASPA)" as the HHS Chief FOIA Officer,

---

[22] The regulatory requirement for a Chief FOIA Officer stems from Executive Order 13,392, 70 Fed. Reg. 75,373 (Dec. 19, 2005) (requiring this officer to carry out general oversight), and the OPEN Government Act, Pub. L. No. 110-175, § 10, 121 Stat. 2524 (2007) (writing this requirement into FOIA statute, codified at 5 U.S.C. § 552 (j)). *See* 81 Fed. Reg. at 39,003-04. Neither the executive order nor the Act authorizes the closure of agency FOIA offices.

and that the "Deputy Agency Chief FOIA Officer" (DACFO) is a "designated" ASPA official who "has been authorized by the Chief FOIA Officer to act upon their behalf to implement" FOIA compliance. *Id.* at 27 (quoting 45 C.F.R. § 5.3). The delegation memoranda that Defendants identify simply carry out these regulatorily-specified delegations of general FOIA oversight power, as Defendants themselves describe. *See id.* at 29-30 (explaining that the Secretary's memorandum designates the ASPA as the Chief FOIA Officer and delegates associated oversight authority to the ASPA, the ASPA's memorandum authorizes the DACFO to carry out Chief FOIA Officer oversight responsibilities, and how, rounding out the chain, the DACFO's memorandum delegates various FOIA administration and implementation down to division officers); *see also, e.g.*, Defs.' Mem., Ex. 8 at 1-2, ECF No. 43-10 (explaining that what the DACFO is delegated, and thus may redelegate and undelegate, is "Chief FOIA Officer duties," including "monitor[ing] [FOIA] implementation," "[o]ffer[ing] training to agency staff," "including concise descriptions of the [FOIA] exemptions in [public] guidelines," and "review[ing]" FOIA administration issues such as the "use of exemptions"); *id.*, Ex. 13 at 1, ECF No. 43-15 (similar); Fourth Holzerland Decl. ¶¶ 84-85 (similar, describing delegation of Chief FOIA Officer authority).

Nothing in the memoranda can be understood to pass down, from the Secretary to the ASPA on down, anything more than the Chief FOIA Officer's general oversight responsibilities. Although these responsibilities can certainly be delegated and in turn undelegated and centralized—enabling Defendants to achieve some of the unified FOIA oversight they wish to achieve—that says nothing about centralizing the basic independent processing responsibilities that belong to the agency FOIA offices themselves. No text or guidance authorizes anyone in the delegation chain to eliminate a division FOIA function and reassign its responsibilities, as the August 1 memorandum purports to carry out. In fact, the prior memoranda *presume* that division

FOIA officers and offices separately exist and will continue to do so, can have certain management duties delegated down to them, and will be generally overseen for FOIA compliance. *See, e.g.*, *id.*, Ex. 7 at 1, ECF No. 43-9 (discussing redelegation down to division FOIA officers); *id.*, Ex. 8 at 2 (discussing training for agency staff and monitoring of FOIA implementation throughout department). And, as they must, the memoranda all state they are acting "[c]onsistent with 45 C.F.R. § 5.3," *see id.*, Ex. 8 at 1, which dictates the structure of HHS FOIA operations and specifies the separate and independent nature of the CDC FOIA and other division FOIA apparatuses, *see supra* Part II.D.1-2. That regulatory language is what governs. To the extent there is any conflict between the regulations and memoranda, the regulations govern. Defendants cannot override them via internal memoranda. *See, e.g.*, *Scott*, 693 F. Supp. 3d at 17; *Libby*, 429 F. Supp. 2d at 41-42.

### 4.    Defendants' Regulatory Interpretation Is Not Entitled to Deference

As a last resort, Defendants contend their regulatory interpretation is entitled to *Auer* deference. Defs.' Mem. 34-36 (citations omitted). But such deference is available only if the regulations at issue are "genuinely ambiguous" and the agency's reading is "reasonable." *Kisor v. Wilkie*, 588 U.S. 558, 574-75 (2019) (quotation marks omitted). Neither condition is met here, *see supra* Part II.D.1, foreclosing deference as a threshold matter, *see Newman v. Fed. Energy Regul. Comm'n*, 27 F.4th 690, 696 (D.C. Cir. 2022). Two other factors bar deference here: Defendants' reading is a "new" one that "conflict[s] with a prior one," and it is merely a "post hoc" rationalization and "convenient litigating position." *Kisor*, 588 U.S. at 579 (cleaned up).

Defendants' reading is novel and contradictory because it departs from their decades-long view that division FOIA offices operate with independent authority under the FOIA regulations and decentralized structure the regulations set out. *See supra* 36-37. Defendants themselves admit their longstanding practice of treating the division offices as "federated" parts of the "significantly decentralized" HHS FOIA system. Fourth Holzerland Decl. ¶ 83. They do not identify any

instance before April 1 when, like now, they have read their regulations as giving OS FOIA discretionary power to absorb other division FOIA offices' entire processing responsibilities, and as providing these division FOIA offices only delegated and thus revocable authority. Defendants simply identify delegations of Chief FOIA Officer responsibilities, *see* Defs.' Mem. 36, which, as discussed, are immaterial here, *see supra* Part II.D.3. Even on Defendants' own terms, their argument fails. They ask the Court to defer not to a clearly stated reading of 45 C.F.R. § 5.3, but instead to one that must be "inferred" as a "corollary" within memoranda that do not actually discuss OS FOIA's "discretion" to process requests or division FOIA officers' authority to do so. *Id.* at 35. In other words, the memoranda do not supply a "vehicle" that can be properly "understood to make authoritative policy" on these questions. *Kisor*, 588 U.S. at 577.

Defendants' reading is a post-hoc one because it arose only during this litigation. Defendants admit that the only authority they invoked to justify the CDC FOIA office closure before litigation was Executive Order 14,210. *See* Defs.' Mem. 5, 39; Defs.' Counter SOMF ¶ 8. They do not identify any instance, prior to their first filing in this case on May 1, where they invoked 45 C.F.R. § 5.3 to justify their decision-making, or where they explained their view that the provision authorized them to close the CDC FOIA office and transfer its functions. *See* Defs.' Counter SOMF ¶ 37; *supra* 5. And, their delegated-authority reading is brand new. They did not articulate this view until the instant briefing; and, as they admit, they did not memorialize it until August 1, five months after the CDC FOIA office closure. *See* Defs.' Mem. 30.

## CONCLUSION

The Court should grant CREW's motion and deny Defendants' motions.

Date: October 21, 2025                Respectfully Submitted,

                                                   */s/ Yoseph T. Desta*

                                                   Yoseph T. Desta (D.C. Bar No. 90002042)

Kayvan Farchadi (D.C. Bar No. 1672753)
Alex Goldstein (D.C. Bar No. 90005086)
Nikhel S. Sus (D.C. Bar No. 1017937)
Citizens for Responsibility and Ethics in
  Washington
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
Fax: (202) 588-5020
ydesta@citizensforethics.org
kfarchadi@citizensforethics.org
agoldstein@citizensforethics.org
nsus@citizensforethics.org

*Counsel for Plaintiff*